# ASSOCIATED CINEMAS OF AMERICA, INC. v. WORLD AMUSEMENT COMPANY.[1]

October 22, 1937.

No. 31,354.

[1]Reported in 276 N. W. 7.

*Samuel P. Halpern* and *Myer R. Shark,* for appellant.
*Jay W. Smith* and *George V. McLaughlin,* for respondent.

JULIUS J. OLSON, JUSTICE.

The parties to this cause are corporate enterprises, plaintiff's business being that of procuring copyrights of and distributing to theatre owners moving picture films, largely of foreign make; defendant's business is that of operating a moving picture theatre in Minneapolis known as the World Theatre.

The action is founded upon three contracts entered into on October 6, 1932. Each contract represented a separate cause of action founded upon defendant's failure to exhibit the film of the play therein identified by appropriate copyright name. As a matter of fact there were seven such contracts entered into at the time mentioned, but only three are here involved, the others apparently having been performed. Plaintiff prevailed on trial had before the court. Defendant's alternative motion for amended findings and conclusions of law, or, if such be denied, for a new trial was denied, and this appeal followed.

Defendant offered no evidence so there are no fact issues to trouble us. The questions of law applicable to the facts will be discussed later.

The contracts are in writing and were duly introduced in evidence. All of them are in substance the same, the only difference being the dates when the respective films provided for in each thereof were to be exhibited by defendant. In substance these are the terms: Defendant agreed to run each picture no less than one week. It was to pay plaintiff as a license fee an advance guaranty of $200, such payment to be made upon C. O. D. print, that is to say, when and as the film, advertising matter, and other items were furnished by plaintiff. In addition thereto, defendant was to pay out of the gross receipts from the playing of the films 50 per cent in excess of $1,250 for each week during the time each of the pictures was run. With respect to the first picture, that being the one in-

volved in the first cause of action, defendant agreed "to play and pay for this picture no later than December 22, 1932." In the event defendant failed or refused to exhibit the photoplay according to the terms of the contract, it agreed with plaintiff that as liquidated damages it would pay, in addition to the advance guaranty of $200, "a sum equal to such percentage of the average daily gross receipts of such theatre during the period of thirty (30) operating days immediately prior to the date or dates when such photoplay should have been so exhibited." As to this picture, the court found that it was "made available to the defendant by the plaintiff on or before December 20, 1932; that in fact, December 20 was fixed as a tentative date for the exhibition of this film; that nevertheless the defendant postponed the running of this picture for some time thereafter and finally on or about March 6, 1933, refused to run the picture, thus breaching the contract as to this picture with plaintiff corporation."

With respect to the second and third contracts the same thing happened. These by their terms were to be played and paid for by March 1 and April 1, 1933, respectively.

We have briefly outlined the duties assumed by defendant under its contract. It is well next to consider what plaintiff's obligations were. It agreed as distributor to grant to defendant as exhibitor a license to operate "under the respective copyrights of the motion pictures designated and described in the schedule." This right was further protected to the extent that defendant was to have "the first run" in Minneapolis. In addition thereto, plaintiff agreed under the third article that during "the life of this contract the distributor agrees not to exhibit or license the exhibition of any such photoplays in conflict with the 'run' or 'protection period.'" The protection period extended over a period of 60 days "computed from the last date of exhibition of each photoplay as fixed herein." Under the fourth article plaintiff agreed to deliver to defendant, pursuant to the contract schedule, positive prints "suitable for exhibition of each of such photoplays for exhibition at the said theatre on the dates specified." Under the seventh article, defendant was not required to accept "any photoplay described in

the schedule as the photoplay of a star, or of a director, or based upon a specific story, book or play, or by an identifying description, any other photoplay of a different star or different director, or based upon a different story, book or play, * * *." In the tenth article plaintiff "warrants that the photoplays herein provided for will not contain any advertising matter for which compensation is received" by it. Under the thirteenth article there is a mutual and reciprocal waiver of liability in the event of impossibility of performance of the contract by reason of the elements, accidents, strikes, fires, insurrection, acts of God, the public enemy, public calamity, etc. On the subject of liquidated damages the seventeenth article provides:

"In the event of the failure of the exhibitor to make any payment provided for hereunder, it is understood that the distributor's damages are not less than the amount of such payment, the parties having expressly stipulated and agreed that it would be impossible for the distributor to minimize or reduce its damages by an attempt to dispose of the rights or licenses herein granted to other parties."

As to the first cause of action, the court found for plaintiff in the sum of $200 as the agreed "guaranteed rental," but granted no further allowance because the gross weekly receipts during the 30 days next preceding December 22 did not exceed the $1,250 minimum specified in the contract. As to the second and third causes of action, the court, in addition to the guaranteed rental, allowed additional recovery strictly in accordance with each contract, i. e., one-half of the average gross weekly receipts in excess of the contract minimum of $1,250. As to all of the contracts here involved the finding is:

"That the contracts are not wanting in mutuality in obligation or remedy; that all of the films were made available to the defendant and that the defendant breached the contracts by refusing to accept and run said films."

■ Defendant's first assignment of error relates to the admission in evidence of plaintiff's exhibit 11, a letter admittedly written by

defendant's president, who had executed as such all these contracts and the one who had full and complete charge of defendant's business. Nor is there any question that the letter relates to the contracts here involved. There was a series of letters passing between the parties. A brief résumé of the correspondence may be helpful. On October 8, 1932, defendant wrote plaintiff inclosing the seven contracts, stating:

"I have made a few changes. * * * I think all you are interested in is getting your money for the pictures and I feel sure that you will be satisfied with the way *I have made out the contracts*. Another thing *I have inserted in the contracts sixty days protection*. That is for your good as much as mine. * * * I don't like C. O. D.'s so I am enclosing check for $200.00 for Two Hearts. You will find that your check will always be in in ample time to clear before you make shipment." (Italics supplied.)

The remaining letters and statements passing between the parties are unimportant until defendant wrote plaintiff on February 23, 1933. Amongst other things it was there said:

"In checking up on the pictures of yours I have played I find outside of one, *I haven't been able to make any money*. You can see from box office statements that you have received from your checker or from this office that the theatre is not making money. *Therefore, it is going to be impossible for me to give you dates on pictures that remain on contract unless you see fit to reduce the price*. Under the present setup I will lose money on three pictures, make something on one and then give you an average. In other words you take money on the pictures where I make money and where I lose money there is no reimbursement made. *So unless you are willing to reduce the price on the remaining pictures to $150.00 flat, I am afraid it will be some time before you get dates*. * * *" (Italics supplied.)

Plaintiff did not "see fit to reduce the price." As a consequence defendant again wrote plaintiff on March 6:

*"There is no use quibbling over this matter,* Mr. Goldberg. *The facts are the contracts cannot be lived up to at the present price and terms.* \* \* \* *Now unless you are willing to concede to the request I made in my previous letter I am just going to forget about your pictures for the time being at least.* Of course if business picks up—okay—I will go through with the contracts." (Italics supplied.)

The two letters last mentioned led to the present litigation. The court was of opinion and so found that these amounted to a repudiation on defendant's part of its contract engagements; hence that plaintiff was not required to go forward. We think the exhibit was properly admitted in evidence, and the court's conclusion that defendant thereby breached its contract is well founded. "Performance is excused when it is prevented or rendered impossible by the other party." 2 Dunnell, Minn. Dig. (2 ed. & Supps. 1932, 1934) § 1790, and cases under note 45. "As a general rule a breach of a contract by one party excuses performance by the other." *Id.* § 1791, and cases under note 46.

"A breach of contract occurs when a party thereto renounces his liability under it, or by his own act makes it impossible that he should perform his obligations under it, or totally or partially fails to perform such obligations." *Id.* § 1798, and cases under note 64.

■ Defendant's next attack is based upon the claim that the fifth article in these contracts has not been complied with by plaintiff. It will only be necessary to quote very briefly therefrom to show defendant's error in making such assertion. The title of the article is "SELECTION OR DESIGNATION OF PLAY DATES." Immediately following the title the article provides:

"The exhibition date or dates of each photoplay, *unless definitely specified or otherwise provided for in the schedule, or otherwise agreed upon,* shall be determined as follows:" (Italics supplied.)

Defendant fails or is unable to recognize the limitation upon which the argument now presented is based. This is obviously so because in each contract there is "in the schedule" a definitely

specified "play and pay" date fixed. The schedule specifically provides: "6. The Exhibitor agrees to play and pay for this picture no later than December 22nd, 1932." (The other contracts are the same except the play and pay dates, which are March 1 and April 1, 1933, respectively.) Further, also on the face of each contract this appears in large printed type: "PLAY DATES or PLAYING ARRANGEMENT." To the right is the typewritten statement: "To be played and paid for by Dec. 22nd, 1932."

"The definite and precise prevails over the indefinite, the particular over the general, and the expressed over what might otherwise be implied." 2 Dunnell, Minn. Dig. (2 ed. & Supp. 1932) § 1828, and cases cited under note 53. "If a contract is partly written and partly printed, the written part controls, if the two parts are inconsistent." *Id.*, § 1829, and cases cited under note 55.

■ It is also urged that the contracts are lacking in mutuality. We think the statement of facts heretofore made compels the same conclusion as that reached by the trial court. After all, it is the duty of the court, when reasonably possible, so to construe a contract as to give it effect rather than to nullify it. 2 Dunnell, Minn. Dig. (2 ed. & Supps. 1932, 1934) § 1822, and cases cited under note 32.

Contracts have been sustained in innumerable cases where the consideration was a promise for a promise. Thus, in Restatement, Contracts, § 81, it is said, "gain or advantage to the promisor or loss or disadvantage to the promisee, or the relative values of a promise and the consideration for it, do not affect the sufficiency of consideration." And 1 Williston, Contracts (Rev. ed.) § 103C, pp. 338, 340, has this to say:

"Lord Blackburn, than whom no better modern authority could be cited, stated the principle as follows:

" 'The general rule is, that an executory agreement by which the plaintiff agrees to do something on the terms that the defendant agrees to do something else, may be enforced, if what the plaintiff has agreed to do is "either for the benefit of the defendant or to the

trouble or prejudice of the plaintiff." ' The Minnesota court has made an equally plain statement:

" 'The case is, then, one of a promise on the part of the plaintiff to do something of advantage in law to the defendant, and on the part of the defendant to do something of advantage in law to the plaintiff—a case of mutual promises, one of which is the consideration of the other. The agreement was valid and binding upon both parties.' [Schweider v. Lang, 29 Minn. 254, 13 N. W. 33, 43 Am. Rep. 202. That case was later followed and applied in First Nat. Bank v. Gallagher, 119 Minn. 463, 465-466, 138 N. W. 681, Ann. Cas. 1914B, 120. Under note 6 the author also cites Finlay v. Swirsky, 103 Conn. 624, 632, 131 A. 420.]

"The elaborate definition given in Currie v. Misa [L. R. 10 Exch. 153], 'A valuable consideration in the sense of the law may consist either in some right, interest, profit, or benefit accruing to one party, or some forbearance, detriment, loss, or responsibility given, suffered, or undertaken by the other,' contains in substance the same principle." (Under note 8 the author significantly remarks: "To have stated the matter exactly, the words, 'or undertaken' which are contained in the last clause of the definition should also have been included in the first clause.")

■ On the question of damages the court in its memorandum remarked:

"One cannot reasonably expect that he can thus repudiate a written contract without being called upon to respond in damages therefor. The method provided in the contracts for arriving at the measure of damages is quite clear and unobjectionable from the standpoint of the law."

It is not unusual for parties to provide in their contracts for the damages to be recovered in the event there is breach or default. The law recognizes the validity of such agreements.

"It is entirely competent for the parties to a contract to provide for the annulment or discharge thereof, either by subsequent valid agreement or by incorporating therein provisions and conditions to

that end; and they may thus limit and determine the rights and liabilities of each in the event of a failure of performance." 2 Dunnell, Minn. Dig. (2 ed.) § 1797a, and cases under note 62.

If the parties were left to proof of actual damages, obviously it would be a difficult thing to accomplish. Here they "expressly stipulated and agreed that it would be impossible for the distributor to minimize or reduce its damages by an attempt to dispose of the rights or licenses herein granted to other parties." Plaintiff under its engagement could not permit anyone else to show its films during the contract period without thereby laying itself open to an action for damages.

Viewing the case from all angles, we are satisfied that the right result was reached. Defendant's only excuse for nonperformance is that under his contracts he could not "make any money."

Order affirmed.

