# RALPH WORMSBECKER v. DONOVAN CONSTRUCTION COMPANY OF MINNESOTA.
## S. J. KRANNAK, DEFENDANT IN INTERPLEADER.

76 N. W. (2d) 643.

March 29, 1956—No. 36,647.

Joseph A. Maun, Mandt Torrison, Jerome B. Simon, and Bundlie, Kelley & Maun, for appellant.

William E. MacGregor, Benedict Deinard, Guesmer, Carson, MacGregor & Clifford, and Leonard, Street & Deinard, for respondent Wormsbecker.

B. J. Loftsgaarden and Loftsgaarden & Loftsgaarden, for respondent Krannak.

KNUTSON, JUSTICE.

This is an appeal from a judgment entered pursuant to the findings of the trial court made after a trial partly to a jury and partly to the court.

The facts essential to a determination of the questions decisive of this appeal, viewed in the light most favorable to the verdict and the court's findings, may be stated briefly as follows:

Prior to March 1949 plaintiff had considerable experience in construction work and real estate sales and promotion. He had familiarized himself with the laws, regulations, and procedures relating to the construction of housing projects under the National Housing Act.[1]

Defendant in interpleader, S. J. Krannak, was a friend of plaintiff. He owned a tract of land consisting of nine acres in Ramsey County at the corner of Larpenteur Avenue and Dunlap Street, which was considered by these two men as suitable for a Federal housing project. They obtained some preliminary plans, consulted with F. H. A. officials, and began to obtain bids and estimated costs. The proposed project was to consist of 20 apartment buildings. Neither plaintiff nor Krannak had the necessary financial resources to carry out the project.[2]

[1]Title VI, § 608 (56 Stat. 303, as amended, 12 USCA, § 1743).

[2]After this action was commenced, Krannak was interpleaded by defendant and claimed to be a partner of plaintiff and entitled to share in any

Defendant, Donovan Construction Company, is a Minnesota corporation owned almost entirely by George Donovan and members of his family. Prior to March 1949 the corporation had been engaged in large-scale, industrial construction projects, but it had not engaged in federal housing projects and was not familiar therewith. None of its officers or employees were familiar with this law.

In the spring of 1949, plaintiff and Krannak approached the Donovans with the object in mind of interesting them, as a joint venture, in the construction of a housing project on the land owned by Krannak, to be known as the Rosegarden project. The Donovans did become interested, but in the meantime plaintiff and Krannak were having difficulty with certain zoning laws which would not permit construction on Krannak's property. They thereupon obtained an option on an adjoining tract of land, known as the Gottfried property. Defendant was not interested in going into the deal as a joint venture but did become interested in the possibility of making money on federal housing projects and of having plaintiff work with the corporation as an employee on such projects. As a result of negotiations, plaintiff and defendant, on April 4, 1949, entered into a written contract which reads as follows:

"An Agreement made this 4th day of April, 1949 between the Donovan Construction Company of St. Paul, Minnesota, a Minnesota Corporation, hereinafter called the 'Company', of the one part, and Ralph Wormsbecker of Minneapolis, Minnesota, hereinafter called 'Manager', (of a Housing Project) of the other part, wherein it is agreed as follows:

"(1) The Company will employ the Manager for the period of time necessary to complete the original contemplated Housing Project, and thereafter until this Agreement shall be terminated by either party giving the other thirty days' notice in writing of such intended termination.

"(2) During the continuation of this Agreement the Manager shall devote the whole of his time during the business hours of the

amount recovered. That issue was tried in a separate action and is not involved here, and no reference will be made to that action.

Company, and shall use his best endeavors to promote the interests and welfare of the Company.

"(3) The Manager shall exercise and carry out all such powers and duties, and shall observe all such directions and restrictions as the Board of Directors or Executive Committee may from time to time confer or impose upon him. The Manager may negotiate trade contracts on behalf of the Company in the ordinary way of business, subject to approval of the Executive Committee.

"(4) The Manager shall be entitled by way of remunerations for his services to a salary of $500.00 per month, and also a commission of 5% on the net profits before income taxes of the Company in the Housing Project.

"This Agreement is made in contemplation that a sponsoring corporation will make application to the F. H. A. for a loan to build a Housing Project of some twenty (20) units to be situated north of Larpenteur Avenue and east of Hamline in Ramsey County. This sponsoring corporation, if successful in receiving loan from the F. H. A., will award the contract of building such Housing Project to the Donovan Construction Company. The stock in the sponsoring corporation will be held 10% by Mr. Ralph Wormsbecker and the 90% by the Donovan Interest. Any commissions on the loan secured by the sponsoring corporation from the F. H. A. will be awarded to the Real Estate Agency with which Mr. Wormsbecker is affiliated.

"Donovan Construction Company,

"By: George Donovan.

"Ralph W. Wormsbecker.

"M. C. Hoogesteger."

Immediately after the execution of this agreement, George Donovan told plaintiff to go out and secure more jobs. Trouble developed in getting necessary sewer and water connections on the Gottfried property. Plaintiff thereafter drove around the Twin Cities looking for other suitable sites, and, with the Donovans, he looked at several such sites. About April 17, 1949, plaintiff learned of the site to be known later as Meadowbrook Manor, which had been considered by other parties for such a project and later abandoned. About two

weeks later, on April 28 or 29, he drove out and looked at the project and reported to George Donovan. On May 1 he went to the Federal Housing Administration and obtained further information on this piece of land. On May 7, defendant executed an earnest money contract offering $40,000 for the proposed site. The owner rejected this offer. On June 10 plaintiff submitted a new offer in the amount of $55,000 for the land required for the housing project and additional land, which offer was accepted.

In the meantime plaintiff had met with village authorities respecting zoning and the procuring of water and sewer connections. He had induced defendant to retain the services of an architectural firm and had continued to work on the Meadowbrook and other projects. Speed was essential, since the National Housing Act was about to expire on June 30, 1949.[3] On May 18 plaintiff reported to defendant that he had secured preliminary approval of three sites, namely, Rosegarden, Ford, and Meadowbrook sites. It is needless to relate all the details following, but it is sufficient to say that the Meadowbrook project eventually was completed and the Rosegarden project abandoned.

Under the National Housing Act, it was necessary to have a so-called "sponsoring corporation" created for the express purpose of engaging in the business of constructing and operating such housing unit and particularly for the purpose of holding legal title thereto. In compliance with this provision, defendant, in November 1949, caused Meadowbrook Manor, Inc., to be incorporated under the laws of Minnesota. Nine hundred ninety-five shares of the capital stock were issued to members of the Donovan family and later transferred to defendant. Five shares of preferred stock were issued to the Federal Housing Administration, as required by law.

To finance the project, a mortgage was obtained from Manufacturers Trust Company of New York for $4,614,800. Under the National Housing Act the government insures the mortgage up to 90 percent of the estimated cost.

---

[3] It was later extended throughout the time here involved.

A contract was let to defendant to construct the project for $4,321,911, which was $292,889 less than the amount of the mortgage. There seems to be no dispute that Donovan, all told, made a profit of $347,712.45. It is not necessary to detail the manner in which this figure is arrived at. It comprises largely the excess of the mortgage, which consists of 90 percent of estimated cost, over actual cost, without deduction for income taxes. In figuring the estimated cost, the sponsoring corporation was permitted to put in the land at a value greatly exceeding the amount paid, and the same was true as to architectural fees, which were estimated considerably higher than the amount paid. The result was that the mortgage actually exceeded the actual cost of the project by a considerable amount.

On June 25, 1949, the question first arose as to how plaintiff would be compensated for his work on the Meadowbrook project. The parties are in complete disagreement as to what then transpired. Plaintiff claims that he insisted that he had a written contract which applied to Meadowbrook as well as to the other projects, and defendant claims that at that time the corporation advised plaintiff that it would not go through with the project on the basis of the written agreement of April 4, 1949. At any rate plaintiff continued to work on the project until December 27, 1949, when defendant submitted a new written contract to him, which he refused to sign.[4]

[4]"This agreement made this 21st day of December, 1949, between the Donovan Construction Company of St. Paul, Minnesota, a Minnesota corporation, hereinafter called the Company, and Ralph Wormsbecker, of Minneapolis, Minnesota, hereinafter called Employee, for the purpose of reducing to writing the verbal arrangements made by the parties hereto on July 1, 1949.

"It is mutually agreed that the contract dated April 4, 1949, signed by the parties, was and is hereby cancelled as of July 1, 1949.

"It is further agreed that the following terms and conditions are to be substituted for said cancelled contract and are effective as of the time of cancellation of said contract:

"1. The Company will hire Employee for the period of time necessary to obtain a 'closing' from the Federal Housing Administration for a housing project, and thereafter until an agreement shall be terminated by either party by giving thirty days written notice to the other.

"2. During the continuation of this agreement Employee shall devote the whole of his time, attention, and energies during business hours for the

As a result, plaintiff ceased work on the project. Here, again, the parties differ as to what took place, plaintiff contending that he was discharged and defendant contending that plaintiff quit. Other facts will be stated in connection with the questions to be determined.

This action was commenced to recover the amounts plaintiff alleges were due him under the express contract. The court submitted seven questions to the jury as a special verdict, which, together with the answers of the jury, are as follows:

"Question No. 1: Was the Agreement, Plaintiff's Exhibit 'A', modified and supplemented (from on or about April 5, 1949, and until June 25, 1949) by words, acts and conduct so as to apply to the F. H. A. project—Meadowbrook Manor?

"Answer: Yes.

"Question No. 2: Did the words 'net profit before income taxes' as used in Plaintiff's Exhibit 'A', exclude unallocated home office overhead and administrative expenses of defendant Donovan Construction Company?

"Answer: Yes.

"Question No. 3: Did the words 'any commissions on the loan secured by the sponsoring corporation from the F.H.A.', as used in Plaintiff's Exhibit 'A', mean the $69,222 received by Meadowbrook Manor, Inc., from Manufacturers Trust Co. of New York on or about December 9, 1949?

"Answer: Yes.

improvement of the Company and shall use his best endeavor to promote the interest and welfare of the Company.

"3. Employee shall exercise and carry out all such powers and duties and shall observe all such directions and restrictions as the Management of the Company may from time to time confer or impose upon him.

"4. Employee shall be paid by way of remuneration for his services the sum of $500.00 per month, and also a commission of 2% on the net profits, free of head office overhead deductions and before income taxes, the Company shall make from the housing project now under consideration, and on any additional housing project that Employee follows through to the 'closing' with F.H.A."

"Question No. 4: Did defendant Donovan Construction Company, on about December 30, 1949, discharge the plaintiff from employment?

"Answer: No.

"Question No. 5: Did plaintiff substantially perform his obligations and duties under his contract of employment (as you find it to be) with defendant Donovan Construction Company?

"Answer: Yes.

"Question No. 6: Did Mr. Wormsbecker violate his employment agreement by his negotiating and receiving a share of the real estate broker's commission on the sale of the Meadowbrook Manor site?

"Answer: No.

"Question No. 7: Did Mr. Wormsbecker violate his employment agreement by his negotiating and receiving a share of the Title Insurance broker's commission on the insuring of the title of the Meadowbrook Manor site?

"Answer: No."

Based upon such verdict, the court made findings of fact on all other issues, adopting the findings of the verdict as far as they went. Judgment was entered thereon, and this appeal is from the judgment.

While defendant assigns numerous errors, essentially the questions presented for our determination are as follows:

(1) Does the evidence sustain the jury's verdict and the court's finding that the contract of April 4, 1949, was modified by the words, acts, and conduct of the parties so that it should apply to the Meadowbrook project?

(2) Is the court's finding that plaintiff performed the modified contract substantiated by the evidence?

(3) Was it error to refuse to submit to the jury the question whether a new contract was entered into on July 1, 1949?

(4) Does the evidence sustain the finding that plaintiff was entitled to recover $69,222 as a commission on the loan under the terms of the contract of April 4, 1949, as modified?

■ At the outset it must be stated that a written contract may be modified after its execution by the acts and conduct of the parties in the same manner as a contract may be entered into in the first place.[5]

■ Under the evidence in this case the jury could find that, after the execution of the contract on April 4, 1949, the parties proceeded with projects other than the one originally contemplated. Defendant takes the position that it was entitled to the services of plaintiff on those other projects without any further compensation than $500 per month salary. It is hardly conceivable that the parties so intended. Even the Donovans admit that they later offered plaintiff two percent of the profits on the Meadowbrook project plus his expenses which it is admitted he drew. The original Rosegarden project was finally abandoned, so plaintiff received no benefits from that project. If we were to accept defendant's contention, it would mean that plaintiff would not be compensated beyond the sum of $500 per month for the work he did on all the projects involved. That claim is wholly inconsistent with defendant's contention that a new agreement was made on July 1, 1949, or subsequent thereto, as shown by the written agreement drafted in December 1949 under which plaintiff was to share in the profit of the Meadowbrook project. The jury was not compelled to so conclude from the evidence in this case. The evidence shows that up to June 25, 1949, much work had been done on the Meadowbrook project. It was largely through the efforts of plaintiff that the site was located and approved. It was through the efforts of plaintiff that defendant became interested in this type of work at all. We see no need of reciting in detail the evidence in support of the jury's finding on question No. 1. It is sufficient to say that we have carefully examined all the evidence and are convinced that this question was for the jury.[6]

■ Defendant next contends that, even if it can be held that the contract was modified so that its terms are applicable to the

[5]Dybvig v. Minneapolis Sanatorium, 128 Minn. 292, 150 N. W. 905; Benedict v. Pfunder, 183 Minn. 396, 237 N. W. 2; Restatement, Contracts, § 21; Lombard v. Rahilly, 127 Minn. 449, 149 N. W. 950.

[6]See, Hartung v. Billmeier, 243 Minn. 148, 66 N. W. (2d) 784.

Meadowbrook project, plaintiff still cannot recover because he did not perform the contract. The argument is that defendant was entitled under the contract to plaintiff's services during the time it was necessary to complete the housing project and that, inasmuch as he left his employment on December 30, 1949, some 18 months before the project was completed, there was such a lack of performance that he is not entitled to recover. On this issue, in answer to question No. 4, the jury found that plaintiff was not discharged by defendant. The court found that plaintiff had substantially performed all the duties he was required to perform and that any further duties which would have been required of him were trivial and plaintiff was prevented from completing such trivial duties by defendant's repudiation of the contract.

It is obvious that plaintiff's duties consisted largely of promotional services and services connected with the procuring of the loan and approval of the project by the Federal Housing Administration. At the time he left defendant's employment, all such work had been completed. He had nothing to do with the actual construction work. The court could have found also that he was willing to complete any unfinished work he had to do but that defendant did not request him to do anything further. The findings of the court are sustained by the evidence. Even in the face of the jury's findings, the court could find that, while plaintiff was not discharged, he was prevented from doing any more work by defendant's wrongful repudiation of the contract. Where a contract is substantially performed and complete performance is prevented by the wrongful act of the defendant in repudiating the contract, plaintiff is entitled to recover under the contract. Performance is excused where it is rendered impossible by the other party. Where one party renounces his liability under the contract or makes it impossible for the other to perform, a breach of the contract occurs.[7] Defendant has failed completely to show what further services it might have expected plaintiff to perform had he not left defendant's employment.

[7]Associated Cinemas v. World Amusement Co. 201 Minn. 94, 276 N. W. 7; 4 Dunnell, Dig. (3 ed.) § 1790.

Defendant next contends that the court erred in refusing to submit to the jury a question as to whether the parties entered into a new contract with respect to the Meadowbrook project on July 1, 1949, or subsequent thereto. Defendant was entitled to a jury trial as a matter of right. Had it insisted on it, it would have been entitled to have submitted to the jury all questions of fact. Under Rule 49 of Rules of Civil Procedure it is now discretionary with the trial court whether to submit the case on a general or special verdict. Rule 49.01 supersedes the first sentence and the first clause of the second sentence of M. S. A. 546.20.[8] The rule liberalizes the former practice under the statute[9] by leaving it to the discretion of the trial court whether to submit the case on a special verdict or not.[10] If a special verdict is used, the parties are entitled to have all fact issues submitted to the jury, and the court must, upon a demand, submit such issues. The findings of a jury under a special verdict are binding on the court.[11]

The functions of a special verdict, as distinguished from interrogatories submitted in connection with a general verdict, are discussed in Roske v. Ilykanyics, 232 Minn. 383, 45 N. W. (2d) 769. The parties may waive a jury trial in whole, or, where a special verdict is used, they may waive submission of a part of the issues to the jury. Under Rule 49.01 the parties waive their right to a jury trial as to any issue raised by the pleadings or the evidence which the court omits to submit to the jury unless, before the jury retires, either party demands its submission to the jury.[12]

The record in this case shows that, after the parties had rested, several motions were made to the court and disposed of. The record discloses that thereafter —

[8]See, 2 Youngquist & Blacik, Minnesota Rules Practice, p. 482.

[9]Roske v. Ilykanyics, 232 Minn. 383, 45 N. W. (2d) 769.

[10]See, 2 Youngquist & Blacik, Minnesota Rules Practice, p. 483; Wright, Minnesota Rules, p. 279; Nordbye, *Comments on Selected Provisions of the New Minnesota Rules*, 36 Minn. L. Rev. 672, 682.

[11]See, 2 Youngquist & Blacik, Minnesota Rules Practice, p. 484.

[12]See, A. M. Webb & Co. Inc. v. Robert P. Miller Co. (E. D. Pa.) 78 F. Supp. 24, reversed on other grounds (3 Cir.) 176 F. (2d) 678.

"Counsel for plaintiff and defendants conferred with the Court in Chambers on Saturday, December 5, 1953 at 9:30 A.M., at which time defendant submitted to the Court and counsel thirteen requested interrogatories, * * *."

Among these were the following:

"12.   Did plaintiff accept the terms of compensation for services on Meadowbrook Manor as offered by defendant on or about July 1, 1949, or at any time thereafter?

"13.   Did the conduct, acts or words of plaintiff on or about July 1, 1949, afford a reasonable basis for the defendant to assume that its offer of July 1, 1949, in respect to compensation had been accepted by plaintiff?"

Defendant also requested that the court charge the jury, among other things:

"Regardless of any contract by conduct consummated during the period between April 5th through June 25th, 1949, if a subsequent agreement was entered into on or about July 1st, 1949, as testified by defendants, the July 1st agreement would negative any earlier agreement, and in the event there was such an agreement of July 1st, your answer to interrogatory No. 1 shall be no."

The record does not disclose what was said in this conference in chambers, nor does it show what disposition was made of defendant's requests, other than that on December 7, 1953, when the case again was resumed, the court said to the jury:

"Members of the Jury before we continue with this case and the arguments of Counsel, I wish to advise you that * * * we are going to submit interrogatories and questions to you in the form of a special verdict. *It has been agreed between Counsel* that the questions be set out in writing and that each of you will receive a copy before the arguments commence so that from time to time as reference is made to one question or the other you will have them before you and you may refer to them yourself." (Italics supplied.)

The record then shows that the court instructed the clerk to pass out the questions to the jury. This language is open to the construction that the court determined what questions would be submitted to the jury and that thereafter the parties agreed that such questions might be handed to the jury. It does not necessarily follow that the parties agreed to the form of the questions or waived submission of other questions that had been requested.

Both parties thereupon argued the case. The argument of defendant's counsel is not included in the record. In its charge to the jury the court said:

"In order to define clearly the issues which the jury is to consider, they have been placed before you in the form of written interrogatories or written questions. As heretofore indicated, there are seven. They have been read to you by counsel and they are before you at the present time in writing. It is unnecessary, in my opinion to reread them. *By consent of counsel* all other issues of fact are withdrawn from your consideration and are reserved to the Court for determination after you have answered the seven questions of the special verdict that will be submitted to you." (Italics supplied.)

While the italicized language would indicate that counsel had agreed to limit the consideration of the jury to the seven written questions, what later transpired throws considerable doubt on that assumption. At this point, it would have been embarrassing for counsel to interrupt the court in its charge to the jury.

After completion of the charge, the court inquired whether there were any suggestions or comments. The record then contains the following notation of the reporter:

"(Discussion at the Bench.)

"Mr. Torrison began to state to the Court the exceptions to the charge of the Court and to *the failure to submit certain interrogatories,* which exceptions are set forth below in the transcript. It was suggested that counsel state exceptions after the jury had left the trial room, and it was agreed by Mr. Torrison and Mr. Deinard and ordered by the Court that that should be done with the understanding that such exceptions would have the same force and effect

as if they had been made before the jury left the trial room." (Italics supplied.)

After the jury had retired, defendant, among other things, excepted to the "failure to submit as an interrogatory the issue as to whether the parties reached an agreement on the Meadowbrook Manor project on or after July 1, 1949, either by oral agreement or through the acts and conduct of the parties." The court said nothing about a former agreement to waive submission of such question to the jury, nor did opposing counsel. It would seem from these proceedings that defendant had not abandoned its earlier request to have such additional question submitted to the jury.

As a preliminary to its final findings of fact, the court stated:

"* * * pusuant to the provisions of Rule 49.01, *and by stipulation of the parties entered upon the minutes of the Court,* certain of the issues were submitted to the * * * jury for a special verdict in the form of special written findings upon certain specified issues of fact, and any additional issues of fact raised by the pleadings or by the evidence not covered by the special verdict were reserved for determination by the Court by its findings without submission to the jury." (Italics supplied.)

The court found in favor of plaintiff in accordance with the jury's answer to question No. 1. It made no specific finding on the agreement which defendant claims was made on July 1, 1949, or subsequent thereto. It did find:

"Except as hereinbefore found, the allegations of the Answer and Counterclaims of defendant are found not true and not sustained by the evidence."

Of course, if the parties did enter into a stipulation or agreement that the seven questions should be submitted to the jury and that all other questions should be reserved for determination by the court, failure to submit the issue to which defendant took exception would have been waived. Defendant now denies having so stipulated. We have no way of knowing what went on between court and counsel in their conference except so far as the record was made of it. It is

difficult to understand why experienced trial courts and experienced counsel cannot see to it that stipulations on matters as important as waiving a jury are not made part of the record. It is true that, under Rule 38.02, waiver of a jury trial may be effected "By oral consent in open court, entered in the minutes." We assume that applies to waiver in part as well as in toto. Unless the minutes of the court are made part of the record on appeal, however, we have nothing before us to show such entry in the minutes. It should be a simple matter to have the reporter note the stipulation of the parties so that the embarrassing situation of a trial court claiming the parties stipulated to something not shown by the record and one of the parties denying such stipulation would not have to be presented here.[13]

As stated before, defendant was entitled to have all issues of fact submitted to a jury except those which were waived. Obviously the contract, even though modified prior to June 25, 1949, so as to make its terms applicable to the Meadowbrook project, could have been modified again by agreement of the parties. Such additional modification would not have been so inconsistent with a prior change that we can say as a matter of law that the jury could not have found both. Even plaintiff admits that after July 2, 1949, he was willing to change the contract so as to accept three percent of the profit on Meadowbrook Manor instead of the five percent specified in the original contract. When we keep in mind the fact that the Meadowbrook project was much larger than the original project, such agreement does not seem improbable. At least, the jury could have found there was some change.

The rule under which defendant had a right to have all questions of fact submitted to the jury does not require the submission of all questions which the parties may request nor of requested questions substantially covered by others but only such as are raised by the pleadings and the evidence and are important to the judgment to be

---

[13]See, Roske v. Ilykanyics, 232 Minn. 383, 45 N. W. (2d) 769; Thompson v. Thompson, 238 Minn. 41, 55 N. W. (2d) 329; see, also, Jensen v. Dikel, 244 Minn. 71, 69 N..W. (2d) 108.

rendered.[14] Nor does it require submission of questions as to which a jury trial is waived. Under the circumstances shown in this case and the record made, we have come to the conclusion that there was no waiver of the submission of requested issues other than the seven questions which were handed to the jury. The question omitted was a vital one in the ultimate determination of the rights of the parties. Defendant attempted to take exception to the court's failure to submit this question before the jury retired. He was requested to wait until the jury had retired. We think that this was a sufficient compliance with Rule 49.01, which requires a demand before the jury retires in order to prevent a waiver of submission of such issue to the jury.[15]

The question omitted was vital to a determination of the rights of the parties. Defendant was entitled to a jury trial of this issue. Our conclusion is that defendant did not waive it, and it follows that being deprived of a jury trial on this issue is reversible error for which defendant is entitled to a new trial.

■ The last question we need consider is whether plaintiff is entitled to recover $69,222 as a commission on the loan under the terms of the contract. The pertinent portion of the contract reads:

"* * * Any commissions on the loan secured by the sponsoring corporation from the F.H.A. will be awarded to the Real Estate Agency with which Mr. Wormsbecker is affiliated."

The court took the position that, inasmuch as this provision in the contract was ambiguous, evidence was admissible to show the intention of the parties. It was defendant's contention that this language referred to a sum which the mortgagee might be willing to pay to one who brought him a mortgage. There is considerable evidence to the contrary. The sum involved was paid to the sponsoring corporation, Meadowbrook Manor, Inc., and by it paid to defendant. Had it simply remained with the Meadowbrook corporation, a different question might be presented. The sum represents one and one-half

[14]Maryland Cas. Co. v. Broadway (5 Cir.) 110 F. (2d) 357.

[15]See, Aetna Ins. Co. v. Rhodes (10 Cir.) 170 F. (2d) 111; Palmiero v. Spada Distributing Co. (9 Cir.) 217 F. (2d) 561.

percent of the amount of the mortgage. It is variously referred to as a financing fee or a commission. George Donovan at one time admitted that, had the Rosegarden project gone through, plaintiff would have been entitled to a similar fee under the terms of the contract. It is true that he later did change that testimony, but the jury could have concluded that his first testimony reflected the understanding of the parties. If that was the proper construction as applied to the Rosegarden project, it was equally proper as to the Meadowbrook project in view of the jury's answer to question No. 1. It is needless to relate the other evidence pertaining to this question. Under the evidence in this case, it was a question of fact properly submitted to the jury, and its answer is against the contention of defendant.

There are other questions raised by defendant. We have carefully considered the evidence in a voluminous record containing over 1,000 pages of testimony. Many of the questions presented are purely questions of fact. Others relate to instructions of the court. Still others relate to the inadequacy of the questions submitted to the jury. In view of our decision that there must be a new trial on all the issues, it is unnecessary to pass on such questions.

Reversed and new trial granted.

UPON APPEAL FROM CLERK'S TAXATION.

On April 20, 1956, the following opinion was filed:

PER CURIAM.

Plaintiff has appealed from the taxation of costs on the grounds, principally, that much immaterial matter is contained in the printed record. Both parties have paid so little attention to our rules in this case that we might be fully justified in leaving them where they are. The printed record contains 1,234 pages. It includes much immaterial matter such as superseded pleadings, opening statements of counsel, and arguments not material to the issues raised on appeal. The briefs of defendant contain 178 printed pages and that of plaintiff 158 printed pages. The task of sifting the material from the immaterial was left to this court. While we feel that plaintiff, as well as defendant, has made little effort to lighten the burden of this

court, we have concluded that there is so much material in the record that should have been eliminated that it is not fair to require plaintiff to pay the entire printing costs.

IT IS THEREFORE ORDERED, that the sum of $500 of printing costs be disallowed.