RALPH WORMSBECKER v. DONOVAN
CONSTRUCTION COMPANY OF MINNESOTA.
S. J. KRANNAK, DEFENDANT IN INTERPLEADER.

87 N. W. (2d) 660.

January 17, 1958—No. 36,771.

*William E. MacGregor, Benedict Deinard, Guesmer, Carson, Mac-*

*Gregor & Clifford,* and *Leonard, Street & Deinard,* for appellant.

*B. J. Loftsgaarden* and *Loftsgaarden & Loftsgaarden,* for respondent.

MAGNEY, COMMISSIONER.

In Wormsbecker v. Donovan Const. Co. 247 Minn. 32, 76 N. W. (2d) 643, an action to recover for services rendered in connection with an F. H. A. construction project, the trial court found for plaintiff on the basis of the jury's answers to certain interrogatories. On the appeal, a new trial was ordered. This litigation was settled on April 12, 1957, without retrial. S. J. Krannak, respondent here, was defendant in interpleader in the above action, claiming that a partnership existed between Ralph Wormsbecker, the plaintiff, and Krannak and that the employment contract between Wormsbecker and Donovan Construction Company was an asset of such partnership. The issues between Wormsbecker and Donovan and the issues between Krannak and Wormsbecker were tried separately. Wormsbecker appeals from the judgment which Krannak secured against him.

For some time Wormsbecker and Krannak had been in the real estate business. At one time Krannak had worked for Wormsbecker and later bought him out. They again became business associates in the fall of 1948. In planning future activities, they became interested in promoting F. H. A. projects and spent considerable time familiarizing themselves with F. H. A. procedure, making inquiries of officials and employees in the local F. H. A. office and others and studying literature which had been furnished them. Since September 1948 Krannak had been the owner of a nine-acre piece of land at 1201 West Larpenteur Avenue, across the street from the city limits of St. Paul. Krannak and Wormsbecker discussed the proposition of building a housing project under the F. H. A. setup on Krannak's land or any other land acceptable to the housing authority. They considered hiring a Mr. Berg, who was familiar with F. H. A. projects, but did not do so because of the problem of financing his employment. Krannak testified that Wormsbecker asked: "How are we going to pay Mr. Berg?" and that Krannak answered: "I don't know, but I imagine we will each have to pay our share," and that Wormsbecker then said: "Yes, but he said he won't be satisfied with just a salary. He wants a per-

centage." They agreed that they probably would have to give him ten percent and then divide the other expenses equally. As at first, they contemplated using Krannak's land for the project, and the question of division of profits arose. Krannak testified:

"* * * We discussed percentages. I said that I wanted to get paid for the land. Then he could have 50% and I would have 50% of the profits over and above it, whatever we made. He said 'That's fine.' "

On March 15, 1949, an agreement was drawn up between Wormsbecker and Krannak relative to an F. H. A. housing project on a part of Krannak's land. It recites that Krannak was to convey his land to "the designated corporation" upon receipt of $7,500 (which appears to have been the amount of the encumbrance) and "it is understood that S. J. Krannak and R. W. Wormsbecker will be equilly [sic] interested, and stay equilly [sic] interested through the whole project, in buildings and construction." This agreement remained unsigned because of inability to get Krannak's land rezoned for the purpose they intended to use it.

On March 17, 1949, an agreement was signed between "S. J. Krannak & R. W. Wormsbecker, By R. W. Wormsbecker," and the Newstrom architectural firm for professional services in connection with the proposed F. H. A. project on the Krannak tract. Wormsbecker made an initial payment of $125 to the architects, which represented one-half of the downpayment of fees. Two days later Krannak gave him his check for $67.50 to cover his share. Later Donovan paid the other half of the downpayment. On March 22, 1949, Krannak secured a 90-day option from one Gottfried to purchase an adjacent piece of land for $15,000. It ran jointly to Krannak and Wormsbecker. Later this option was extended to August 1, 1949. They then had in mind using the Newstrom plans on the Gottfried land.

Krannak and Wormsbecker soon realized that they were unable to finance an F. H. A. project. They had tried unsuccessfully to work out a deal with the Sauers Construction Company so Wormsbecker suggested that they go and see Donovan Construction Company, which they did. Their first meeting was with Richard Donovan. Wormsbecker and Krannak told him what they knew about F. H. A. housing. Together

they had worked up their familiarities with F. H. A. projects. Mr. Donovan said that he and his father knew nothing about F. H. A. housing. They also told him about the land they had contracted for and that they thought a larger housing project could be built on this land if they could get financing. Donovan said that he thought the company would be interested but that it would have to be talked over with his father. Later, probably the last week in March, Wormsbecker and Krannak met with the two Donovans and their engineers. The proposition was presented, and they showed the Donovans some architectural drawings of an F. H. A. project. Wormsbecker and Krannak then made a certain proposition to Donovans which involved an investment of about $60,000 by Donovans, who turned it down. Donovans then made a counterproposal whereby each party was to put in $25,000, which Wormsbecker and Krannak later turned down. Then Krannak suggested to Wormsbecker, according to his testimony, that Donovan finance the whole project and "we would take whatever we could get out of it, work out a percentage, here and there, different things, but we would work something out of that," and then Wormsbecker said: "We will work out a basis of whereby we would get a percentage of the contractor's fee or profits, and get the finance commission or fee, that they call it, and whatever else we could get." They decided to go back to Donovans and suggest this proposition. Wormsbecker did go back.

On April 4, 1949, a contract was entered into between Wormsbecker and Donovan. By its terms, Donovan agreed to pay Wormsbecker ten percent of the stock of the proposed corporation which would own the finished buildings, five percent of the profits in construction, the one and one-half percent commission on the mortgage, and $500 per month. Before this agreement was signed, Wormsbecker called up Krannak and told him about the offer. Krannak testified:

"Well, Mr. Wormsbecker called me by phone and said that he had gone over and talked to Donovans and they are offering him a percentage of the profits, of the contractor's fee which would be, and I said, 'How much?' and he said, 'Well, I am going to get 5 or 10 per cent.' I says, 'All right, what else?' He said, 'I am going to get the finance fee or the finance commission.' I says, 'Yes, that's fine.' He

said, 'What do you think of it?' I says, 'It sounds good.' He said, 'I will tell you another thing. They want me to go to work for them and they are going to pay me $500 a month if I go to work for them,' * * *."

Krannak further testified that he said to Wormsbecker:

"* * * 'you keep that $500 a month for yourself. I have some other business that I have to take care of and I will work my personal affairs along so I can—I will keep alive and keep going and pay expenses and so forth while we are working this deal out, and you say on the $500 a month, you can keep that.' "

He further testified that, after Wormsbecker told him that he was to get $500 a month, he asked:

"* * * 'What do we have to put into this?' And he said, 'Well,' he said, 'they are going to finance the whole thing.' And I said, 'Well, that sounds good,' I said, 'Well, is there anything else you can get?' He said, 'I am going to get all I can.' And I said, 'Then what?' And he said, 'Well, whatever we get we will divide it equally.' I said, 'That sounds all right to me. You keep that $500 a month for yourself and I will keep working on my own things,' and he said, 'Fine.' "

According to Krannak, Wormsbecker said:

"* * * 'We have a good big company back of us and we can build more FHA projects, so keep looking for land,' "

and Krannak answered, "All right, I will do that." Later Krannak testified:

"Mr. Wormsbecker said to me, * * * 'Now, Steve,' he says, 'We agree that you continue working on what deals you have had or what you may do in between, and I am going to continue working for Donovans. I get the $500 a month and you can work continually trying to find land because you and I can gain considerably by having more projects, as Donovan said they wanted four or five projects, even out of town they will go on large projects, and you continue looking for land, and the more we get the more we will get out of it, the more projects we get started the more we can get out of it,' * * *. So I said, 'All right, I will continue looking for land,' and

which I—well I kept right at it, put in considerable time at it."

Wormsbecker's version of how his contract with Donovan came about and his conversation with Krannak concerning it is very much different from that testified to by Krannak.

Donovan was interested in using the Gottfried land, on which Wormsbecker and Krannak had an option, for a housing project. This was the property the parties had in mind when Wormsbecker and Donovan entered into their contract. Meetings were held with the village council relative to zoning and water and sewer installations on this property, and Donovan had representatives present at one meeting. However, nothing developed as to Donovan's use of this property for a housing project. The option expired on August 1, 1949. The property later was sold to Sauers Construction Company, and Krannak was paid a commission on the deal. A housing project was built by Sauers on the property. After Donovan abandoned the idea of using the Gottfried tract, Wormsbecker located some land in St. Louis Park, which Donovan purchased and proceeded to construct a large F. H. A. project called Meadowbrook Manor.

Krannak testified that after Wormsbecker's employment by Donovan he continued to look for land suitable for F. H. A. projects. Wormsbecker said that the only property suggested by Krannak in the latter part of 1949 was the old Aberdeen Hotel site in St. Paul. The F. H. A. would not approve it.

In the latter part of 1949, Wormsbecker's employment with Donovan ceased, and shortly thereafter he approached Krannak relative to the development of other housing projects. On January 16, 1950, Krannak entered into an earnest money contract on a piece of real estate, which later on became known as California Drive Apartments. He paid down $200. On January 19, 1950, Wormsbecker delivered a check for $100 to Krannak "For ½ Interest on Larpenter & Dunlap," the California Drive property. On January 28, 1950, an option agreement was entered into between Krannak and D'Arcy J. M. Leck on the same property. On March 6, 1950, Wormsbecker and Krannak entered into an agreement relative to the handling of that property. They agreed that they were to share any and all expenses and profits received from the sale of the California Drive project. They also

agreed that "All future projects that may be promoted by and between S. J. Krannak and Ralph W. Wormsbecker are to be on the above equal basis." On March 6, 1950, Krannak assigned to Wormsbecker a one-half interest in the contract for deed he had on the California Drive property. When that project was completed, they shared $26,000 between them.

The record discloses that Wormsbecker and Krannak were very close friends. They frequently, prior to April 1949, had lunch together and engaged in many telephone conversations. In the fall of 1948, they went deer hunting together. It also discloses that all the F. H. A. projects in which they were interested together, whether such projects materialized or not, both prior to Wormsbecker's employment with Donovan and after that employment ceased, were on a 50-50 basis— a sharing equally of expenses and profits. As to Krannak's land, they were to divide expenses equally with a 50-50 division of profits. They divided equally the initial payment to the Newstrom architectural firm. The Gottfried option ran to them jointly. Each paid half of the earnest money on the California Drive project, with agreement that they were to share all expenses and profits in connection therewith and that all future projects promoted by them should be handled on the same equal terms. They had spent considerable time together gathering information about the workings of the F. H. A. program. They were well versed in the regulations and requirements. Krannak apparently was the more aggressive of the two; he acquired all the commitments on properties on which they were promoting F. H. A. projects.

■ The evidence supports the finding that a partnership existed between Wormsbecker and Krannak. There is nothing unreasonable or improbable in Krannak's claim of an existing partnership in view of the close relationship between the parties and the nature of the dealings between them. Wormsbecker's duties with Donovan involved chiefly F. H. A. housing, and F. H. A. housing was the one field in real estate activities where the two men had jointly prepared themselves to handle efficiently and the one field in which they had been actively working together.

■ Whether a partnership existed between Wormsbecker and Krannak during the time Wormsbecker was employed by Donovan is the

main specific issue raised on this appeal. The court found that, in accordance with the evidence and the answer of the advisory jury, such partnership existed in all F. H. A. projects promoted by them or either of them and that during said period all acts of plaintiff referred to were performed in behalf of the partnership and not individually and that all of Wormsbecker's recovery in the main action is an asset of said partnership. The trial court's finding must be sustained if the evidence as a whole shows that the parties had entered into a contractual relation of partnership.

In Cyrus v. Cyrus, 242 Minn. 180, 183, 64 N. W. (2d) 538, 541, 45 A. L. R. (2d) 1002, this court said:

"* * * Except in those rare cases where the evidence is conclusive, partnership or no partnership is a question of fact. Since there is no arbitrary test for determining the existence of a partnership, each case must be decided according to its own peculiar facts; and upon appeal this court will not disturb the findings of the trier of fact unless the evidence is conclusive."

See, also, Meagher v. Fogarty, 129 Minn. 417, 152 N. W. 833; Hammel v. Feigh, 143 Minn. 115, 173 N. W. 570; Randall Co. v. Briggs, 189 Minn. 175, 248 N. W. 752; Hansen v. Adent, 238 Minn. 540, 57 N. W. (2d) 681.

■ The assignments of error are numerous. The first and most important one, which we have already disposed of, involves the court's finding of the existence of the partnership. Wormsbecker also complains of the submission of two special interrogatories to an advisory jury and the method of submission. We can find no cause for complaint on this score. But if anything improper existed in that connection, it is immaterial in view of the fact that the court, in addition to adopting the answers of the advisory jury, also found the same facts on the evidence.

Wormsbecker also complains of the impropriety of certain questions asked of him by Krannak's counsel and of certain statements made by him in the closing argument to the jury. The record here would have been cleaner if some of the claimed improprieties had been omitted, but we can find nothing to sustain a claim of prejudice resulting therefrom. This case is essentially a court case, and it does not seem

possible that the trial judge would have been influenced by the claimed improper questions or statements in a manner prejudicial to plaintiff.

Several other claimed errors are argued in the briefs, but none so material, if errors at all, as to have any influence on the result in this case. It seems unnecessary, therefore, to comment upon them.

Judgment affirmed.