Ellen D. GRAVLEY, Trustee for the next of kin of Kurt Oliver Gravley, Appellant,

v.

SEA GULL MARINE, INC., Respondent.

No. 48081.

Supreme Court of Minnesota.

Aug. 18, 1978.

John F. Fletcher, St. Cloud, for appellant.

Quinlivan & Williams, St. Cloud, for respondent.

Heard before PETERSON, TODD, and GODFREY, JJ., and considered and decided by the court en banc.

PETERSON, Justice.

Plaintiff, Ellen Gravley, brought this wrongful death action as trustee for her deceased son, Kurt, who died in an accident which occurred while he was driving a modified motorcycle purchased from defendant, Sea Gull Marine, Inc. (Sea Gull). Plaintiff appeals from the judgment for defendant entered upon the trial jury's special verdict. The appeal centers upon the propriety of the limited special verdict questions submitted to the jury, the instructions relevant to those questions, and the limitation of closing arguments to the questions posed.

Plaintiff's claim is that Sea Gull was liable for negligence, breach of implied warranty, and strict liability in tort for sale of a defective, used 500 cc. 1971 Kawasaki motorcycle for the use of plaintiff's deceased son. Sea Gull, which is engaged in the purchase and sale of boats, snowmobiles, and motorcycles in St. Cloud, Minnesota, purchased the motorcycle from one Michael Sjogren sometime in late May 1972 and sold it to plaintiff weeks later.[1]

Sjogren purchased the motorcycle new and later modified it in several respects. The principal modification, the focus of the claimed defect, was to extend by 10 or 12 inches the shock-absorbing tubes on each side of the motorcycle's front wheel, giving the motorcycle something of a so-called "chopper" effect. Sjogren made this modi-

---

1. As part of the transaction the Gravleys traded to Sea Gull a smaller 250 cc. Kawasaki which decedent Kurt had used.

fication with a kit for that purpose which he purchased from a motorcycle shop. The other modifications, about which there is minimal evidentiary consideration, were replacement of the stock handlebars with longer Z-bars (which placed the handle grip controls closer to the body) and replacement of the stock seat with a "king and queen seat" (which placed the passenger seat at a higher level than the driver's seat). Sjogren drove his motorcycle another 1,000 or 2,000 miles before selling it to Sea Gull.

Decedent, Kurt Gravley, died as a result of injuries sustained in an accident 21 days after the motorcycle was purchased from Sea Gull. Kurt was driving the motorcycle on County Road No. 1 in Otter Tail County, near Otter Tail Lake. In that vicinity County Road No. 1 is a two-lane, tarred highway which bridges a small stream near the lake. Kurt approached the bridge, traveling south, at a speed described by a witness as "fast." At about the same time Orval Peterson, a 66-year-old retired farmer, was approaching the bridge traveling north at slow speed. Peterson saw Kurt "lose control" of the motorcycle when he hit a large chuckhole in the roadway at the northern approach to the bridge. Peterson applied his brakes and stopped his automobile at the southern approach to the bridge. Kurt's motorcycle turned on its side, and Kurt and the motorcycle slid about 15 feet along the surface of the bridge and struck the front of Peterson's stopped automobile.

The crux of plaintiff's claim is that in the modification of the front shock-absorbing tubes, certain "spacer bars" were omitted, resulting in a loss of front-end suspension, which in the uncontroverted opinion of an expert would make the motorcycle "totally unsafe."[2] The jury had before it the testimony of both lay and expert witnesses from which it could properly determine that the

spacer bars were in fact present at the time the motorcycle was sold to plaintiff. A friend of Kurt's testified that the two had briefly exchanged motorcycles while traveling together and that Kurt's motorcycle "smoked excessively" and did not have "any front suspension." However, when Kurt had thereafter returned the motorcycle to Sea Gull for service, the service repair order noted the customer complaint as "no power," with no mention concerning front suspension. Michael Sjogren, who had made the modification, had thereafter driven the motorcycle 1,000 to 2,000 miles and testified that the front suspension remained in as good condition as before the modification. Plaintiff's expert witness testified that if spacer slugs had not been added when the front tubes were extended the motorcycle would not absorb shock "at all" and that a motorcyclist would have noticed such problem immediately.

There was, on the other hand, evidence that spacer slugs were not present when the motorcycle was examined several days *after* the accident. The same day the accident occurred, the sheriff took the damaged motorcycle to a nearby business establishment. From there, the motorcycle was moved to the residence of plaintiff's brother-in-law. About 2 weeks after the accident, the motorcycle was sold to Don Young, who was then in the business of buying and rebuilding wrecked motorcycles. Young took possession from the brother-in-law. Young testified that the side case for the ignition was broken, the handlebars twisted, and the front suspension tubes collapsed. Young found, upon examination, that there were no spacer slugs inside the front tubes.

The trial court submitted to the jury this single question of fact responsive to plaintiff's theories of negligence, breach of war-

---

**2.** The front suspension tubes are mounted on each side of the motorcycle's front wheel. On each side they consist of a metal "upper tube" which slides inside a larger diameter metal "lower tube." The upper end of the upper tube is closed off, as is the lower end of the lower tube. Inside each set of tubes is a spring which is normally under tension and thus will absorb shock from the front wheel. The modification

performed by Michael Sjogren (the motorcycle's original owner) consisted of replacing the original upper tube on each side of the wheel with upper tubes which were 12 inches longer than the originals. When this is done, a spacer slug is necessary inside the tube to take up the extra space and keep tension on the spring. Insertion or removal of spacer slugs is apparently accomplished without difficulty.

ranty of merchantability, and strict liability:

> "At the time Sea Gull turned over possession of the cycle was there a lack of front suspension?"

The court informed counsel that this would be the first special verdict question and that if the jury answered this question "yes" it would constitute a finding of negligence and the court would hold as a matter of law that defendant had breached implied warranties and was strictly liable in tort. In accordance with this determination, the trial court declined plaintiff's request to instruct the jury concerning the law of implied warranties and strict liability in tort and directed counsel to avoid these topics during closing argument.

The jury found in answer to the question that the motorcycle did not lack front suspension when it was sold to plaintiff. It found in response to other special verdict questions that decedent was negligent, that his negligence was a direct cause of the accident, and that plaintiff's damages were $5,000.

■ 1. Plaintiff contends that the trial court erred in formulating the special verdict questions and placing corresponding limitations on its instructions to the jury and counsel's final arguments. Plaintiff argues, first, that the court should also have submitted special verdict questions concerning Sjogren's other modifications, the king and queen seat and the Z handlebars. The short answer to this argument is that plaintiff did not request special verdict questions concerning these modifications. The evidence would not, in any event, warrant such submission. Testimony at trial was limited to an opinion that they would enhance the dangerous condition of a motorcycle which lacked front suspension. It is clear on this record that the presence or absence of front suspension was the critical fact on which both parties focused. It is understandable, then, that plaintiff did not request special verdict questions concerning the seat and handlebar modifications. Under Rule 49.01, Minnesota Rules of Civil Procedure, factual questions concerning these modifications were waived. See, *Wormsbecker v. Donovan Const. Co.*, 247 Minn. 32, 76 N.W.2d 643 (1956).

■ Plaintiff argues, second, that the court erred in not submitting to the jury its proposed question referring to breach of implied warranties and strict liability in tort.[3] We find no error in the trial court's determination that these theories, as presented at trial, hinged on the fact of whether the motorcycle lacked front suspension when sold to plaintiff. Special verdict questions should be questions of either evidentiary or ultimate fact. *Thielbar v. Juenke*, 291 Minn. 129, 189 N.W.2d 493 (1971). In deciding what form these fact questions should take, the trial court has broad discretion. *Hill v. Okay Const. Co.*, Minn., 252 N.W.2d 107, 118 (1977). A finding that the motorcycle lacked front suspension was the evidentiary finding critical to plaintiff's breach of warranty and strict liability theories, so it was not error for the trial court to formulate the special verdict to pose the dispositive evidentiary question rather than the more general questions offered by plaintiff.

The trial court properly declined to instruct the jury on the law concerning breach of implied warranties and strict liability in tort. Rule 49.01, Minnesota Rules of Civil Procedure, states that in instructing the jury in connection with special verdicts: "The court shall give to the jury such explanations and instructions concerning the matter thus submitted as may be necessary to enable the jury to make its findings upon each issue." The fact issue posed by the

---

**3.** The proposed special verdict questions were: "1. Did Sea Gull Marine, Inc. sell a defective and unreasonably dangerous motorcycle for the use of Kurt Gravley and/or

"Did Sea Gull Marine, Inc. breach its implied warranty of merchantability in its sale of this motorcycle for Kurt Gravley's use?

"2. Was the breach of the above duties a direct contributing cause of Kurt Gravley's death?

"3. Was Sea Gull Marine, Inc. negligent in either its sale, testing, supplying, and/or repair of the motorcycle sold for Kurt Gravley's use?"

first question was whether or not the motorcycle had front suspension, and instructions concerning the law of strict liability in tort and breach of implied warranties were not "necessary to enable the jury to make its findings" on that question or any of the other questions posed by the special verdict.[4] It accordingly was proper for the trial court to require that counsel limit final argument to the fact question posed in the special verdict.

■ 2. We turn to other issues raised by plaintiff, two of which relate to the proper measure of damages and the adequacy of the jury's assessment of damages. Minn.St. 573.02, subd. 1, provides that in wrongful death actions damages are "such an amount as the jury deems fair and just in reference to the pecuniary loss resulting from such death * * *." In *Fussner v. Andert,* 261 Minn. 347, 113 N.W.2d 355 (1962), we expanded the concept of "pecuniary loss" to include loss of advice, comfort, assistance, and protection which the jury might find to be of pecuniary value and which the survivor could reasonably have expected if the decedent had lived. This measure of damages has been applied in subsequent cases and recently was reapproved in *Cummins v. Rachner,* Minn., 257 N.W.2d 808, 814 (1977). Plaintiff, however, urges an expansion of this settled measure of damages to include the costs, expenses, and time which parents "invest" in raising a child, computed from the time of birth to the time of the child's death. A child, however, is not a monetary investment, and we do not find the analogy persuasive. The trial court properly instructed the jury in accordance with Fussner, and we decline plaintiff's invitation to again reinterpret the meaning of pecuniary loss.

■ Plaintiff asserts that the jury's assessment of damages at $5,000 is so manifestly inadequate that it could only have resulted from passion or prejudice. The assessment of damages is the province of

the jury, and in its assessment here we find no evidence of passion or prejudice.

■ 3. Plaintiff contends that the trial court erred in instructing the jury concerning the rule laid down in Minn.St. 169.14, that speeds in excess of the speed limit are prima facie evidence that the speed is unreasonable. We have examined the trial court's instruction on this point and find that it does accurately reflect the substance of the statutory rule.

■ 4. The final issue raised by plaintiff concerns the trial court's exclusion of certain testimony as hearsay. Plaintiff sought to introduce testimony from two of Kurt's friends who would have testified as to statements purportedly made by Kurt concerning how the motorcycle ran and what repair work he wanted performed by defendant. The trial court ruled that such testimony concerning Kurt's out-of-court statements was inadmissible hearsay.

In challenging that ruling plaintiff contends, first, that the evidence was not hearsay, because it was not offered to show the truth of the statements Kurt purportedly made but only to show that Kurt made statements on those subjects. The obvious purpose for eliciting testimony as to Kurt's purported statements about the motorcycle, however, was to show the truth of those purported statements, and as such was plainly hearsay.

Plaintiff argues, second, that the testimony sought from Kurt's friends should have been admitted under Minn.St. 595.04, the so-called "deadman's statute," which bars any party to an action from testifying as to a conversation with a deceased or insane person concerning any matter at issue between the parties. It is true that the witnesses here, Kurt's friends, were not parties to the action. But that fact is irrelevant. The effect of the deadman's statute, where it applies, is to *prevent* the admission of hearsay testimony which would otherwise

---

4. Commentators have noted that one of the advantages of the special verdict is that "the need for lengthy and complicated instructions upon the law is obviated [because], the trial

court has the duty of applying the law to the facts found by the jury." Youngquist & Blacik, 2 Minnesota Rules Practice, p. 483.

be admissible under an exception to the hearsay rule. *Engel v. Starry,* 268 Minn. 252, 128 N.W.2d 874 (1954). The statute never has the effect of allowing the admission of hearsay. The trial court properly excluded the testimony in question.

Affirmed.

OTIS, J., took no part in the consideration or decision of this case.