269 Minn. 393 (1964)
131 N.W. (2d) 220
IN RE ESTATE OF ELIZABETH CECILIA MURPHY.
GORDON F. O'KEEFE AND OTHERS
v.
GEORGE F. MURPHY AND OTHERS.
Nos. 39,054, 39,055.
Supreme Court of Minnesota.
November 6, 1964.
*394 Gordon Rosenmeier and John E. Simonett, for appellants.
Ryan, Ryan & Ebert, for respondent George F. Murphy.
Nolan, Alderman & Holden, for other respondents.
ROGOSHESKE, JUSTICE.
Appellants are the proponents of an undated instrument offered as the last will of Elizabeth Cecilia Murphy, usually known as Bess or Bessie C. Murphy. The instrument was refused probate and this appeal is from an order of the court denying a motion for amended findings or in the alternative a new trial.
Decedent died on October 13, 1961, at age 74, a retired school teacher and unmarried. She resided in Brainerd and her sister, Helen C. Steiger, called Nell, had lived with her for 20 years. Nell's husband also lived there until his death in 1954. After a confining illness of about a year, Nell died at age 81. Bess' death occurred 4 days later.
Decedent's surviving next of kin are her brother George Murphy, an objector, and the following nieces and nephews: Thomas E. Murphy and Alice Jean Murphy, surviving children of the decedent's brother Edward Murphy, who, with Margaret Kemper, a daughter of decedent's predeceased brother, Joe Murphy, also filed objections; and Gordon, Betty, Donald, James, George, and John O'Keefe, the surviving children of the decedent's sister, Mae Agnes Murphy O'Keefe. The O'Keefe children are the proponent-appellants. They offered the following instrument for probate, which it was claimed was executed by decedent in January or February 1956:
*395
 "This House and Store
 to you Nell and Betty
 or survivor, and
 1.00 to Tommy Murphy
 1.00 to Jean and
 rest divided between
 Nell Steiger, and 
 okeefe children 
 Donald, Gordon 
 Geo  Jimmie, Betty 
 John 
 House at 305 N. 10 st.
 Nell and Betty 
 Key
 "Bessie C. Murphy
 Annie L. Carney
 Gertrude O'Keefe"
Following a contested hearing, the instrument was admitted by the probate court as decedent's will. The objectors filed two separate appeals from the probate court's order to the district court. After a joint de novo trial, the district court reversed the probate court and disallowed the instrument as decedent's will.
The issues raised before the district court by the objectors were lack of due execution, lack of testamentary capacity, undue influence, and improper alterations of the instrument subsequent to its execution. Following the trial before an advisory jury impaneled pursuant to Rules 39.02 and 52.01, Rules of Civil Procedure, the objectors conceded that the evidence established that decedent possessed testamentary capacity and was not subject to undue influence. Accordingly, those issues were withdrawn. The only two issues submitted and determined by the court were improper alteration and whether or not the instrument was executed in accordance with Minn. St. 525.18, subd. 1, which provides:
"Every person of sound mind, not a minor, may dispose of his estate, or any part thereof, or any right or interest therein, by his last *396 will in writing, signed by him or by some person in his presence and by his express direction, and attested and subscribed in his presence by two or more competent witnesses."
The evidence is without dispute that the decedent was a strong-minded, intelligent woman who spent her time reading, managing her security investments, and devoting herself to gardening and raising flowers. She seldom left her home and was quiet and frugal and unusually secretive about her business affairs. Only Donald O'Keefe, her nephew who had prepared her income tax returns over a period of 20 years, was aware that she had amassed a substantial estate. All who testified on the matter agreed that an attempt to draft her own will because of her unwillingness to discuss her financial affairs with anyone would be quite in keeping with her character.
Of the two witnesses whose names appear on the instrument, only Gertrude O'Keefe testified. Mrs. Annie L. Carney, a widow, died in the latter part of November 1960. Gertrude O'Keefe is the wife of Gordon O'Keefe, one of the nephews who is named as a beneficiary. She testified that the instrument was executed on a Sunday morning in January or February 1956. Mrs. Carney, who lived in one of the three apartments of the decedent's house and whose apartment was on the first floor adjoining the decedent's apartment, was then 83 years old; Bess was 69 years old; and Nell was 76. Gertrude O'Keefe further testified that at the time the instrument was executed, she was visiting the decedent in her home, which she occasionally did on Sunday mornings during the time when her husband was attending church. Her testimony was explicit that decedent brought the paper from Mrs. Steiger's bedroom and stated that it was a will and she wanted her to read and sign it. Decedent then opened the door to Mrs. Carney's apartment and asked her to join them. While they were having coffee, decedent read the instrument aloud and then she had each witness read it. Thereafter decedent signed it in their presence and the witnesses signed their names in the decedent's presence and in the presence of each other.
All of the testimony submitted by proponents was directed to corroborate the testimony of Mrs. O'Keefe. Included in such testimony *397 was the opinion of an expert in the field of questioned documents, who declared that the signatures of the decedent and Mrs. Carney were genuine. It was also brought out in the proponents' case that following the decedent's funeral Gordon O'Keefe was, by agreement of all the heirs, named as special administrator. He spent a month carefully searching the home for the purpose of gathering together all things of value, as well as to search for a will. Neither Gordon O'Keefe nor any of the decedent's next of kin was ever aware that she had executed a will. He made inquiries of persons who he felt might know whether or not there was a will. Although his wife, Gertrude, recalled the occasion of her signing an instrument about 5 years prior to her husband's search, she did not disclose to him or anyone else, either before or after decedent's death, that decedent had executed what she declared to be her will. Mrs. O'Keefe's explanation for not doing so was that the decedent had enjoined her to secrecy, and notwithstanding her husband's efforts to find a will she kept it secret until November 17, 1961, when the instrument was found in a box under the bed in Nell's room.
An instrument purporting to be the will of Mrs. Steiger was also found in the home in Bess' room. This will, dated in 1960, gave all of her property to Bess. It was admittedly executed improperly because Anne Laipple, a subscribing witness and a tenant in one of the apartments of the home at the time, testified that she signed it at the direction of Bess Murphy when Nell was not present to affirm that her signature had been affixed to the instrument.
The objectors' testimony sought to discredit Mrs. O'Keefe's testimony and sought to persuade the court and jury that the instrument written in pencil amounted to no more than a memorandum of an intention to make a will. They contend that it was not treated by the decedent as a testamentary disposition, relying upon testimony and evidence to the effect that it was not found among her possessions and was apparently kept under Nell's bed in such a manner that it became stained and discolored; that all of the decedent's heirs who had a natural claim upon her bounty were equally in decedent's favor and that no reason for disinheriting the objectors or *398 preferring the O'Keefe children appeared; that according to the testimony of Mrs. Josephine Nash, a graphologist called by objectors as an expert witness, the signatures of decedent and Mrs. Carney were forged; that the body of the instrument was admittedly not written by decedent but by Nell, who was one of the principal beneficiaries and who, in the opinion of the graphologist, forged the signatures; and that the testimony of Gertrude O'Keefe is inherently improbable in view of her failure to have disclosed to her husband the existence of what she knew to be a will during his long and intensive search of the home. They further argue that both the jury and the court found her testimony false, as it was also impeached by her relationship to her husband  who had an interest in the outcome of the case  and by the testimony of another of objectors' expert witnesses that if the will had been signed on a dining room table on which there was a tablecloth, as testified to by Mrs. O'Keefe,[1] it should have been embossed, which it was not according to this expert.
At the conclusion of the trial the proponents took the position that the only disputed issue of fact was due execution and by appropriate motions requested that the court discharge the jury and make findings thereon. The court ruled that the issue of alteration was also presented and refused to discharge the jury, declaring that "the Court has a right to submit jury issues to the jury to ease the conscience of the Court." Thereupon the following interrogatories, presumably prepared by the court, were submitted and answered by the jury upon instructions to which proponents made no objection other than as to the lack of evidence on the issue of alteration:
"First interrogatory: Did the decedent Bessie C. Murphy, at her home in the city of Brainerd, on a Sunday morning in either the months of January or February, 1956, in the presence of one Annie L. Carney and of one Gertrude O'Keefe, sign a document, herein *399 referred to as Exhibit 2A with her signature to-wit: Bessie C. Murphy, and further did she then and there immediately declare in the presence and hearing of both said Annie L. Carney and said Gertrude O'Keefe that the instrument referred as Exhibit 2A was her will and that she wanted said Annie L. Carney and said Gertrude O'Keefe to then and there sign the same as witnesses thereto and further did the said Annie L. Carney and Gertrude O'Keefe then and there in the presence of the decedent Bessie C. Murphy and of each other after said signing by the decedent Bessie C. Murphy, sign said instrument designated as Exhibit 2A as witnesses thereto as follows, to-wit: Annie L. Carney and Gertrude O'Keefe?
"Answer: Yes or no.
"Answer: No.
"Second interrogatory: Have the terms of the instrument here known as Exhibit 2A been changed and altered since that Sunday morning in either January or February, 1956 when it is contended by proponent that it was executed?
"Answer: Yes or no.
"Answer: Yes."
In the findings the court adopted the jury's answer on the issue of execution "as its own finding." The jury's answer on the issue of alteration was rejected for want of evidentiary support and the record unquestionably requires this conclusion.
Although assignments of error are made with respect to procedural matters[2] and permitting one of objectors' expert witnesses to conduct an experiment of writing on a tablecloth, proponents' principal complaint urged below and here is that there is not sufficient evidentiary support for the following critical findings concerning execution:
"19. That the decedent did not at the time and place set forth in paragraph 15 hereof [Sunday morning in either January or February *400 1956] in the presence of one Annie L. Carney and of one Gertrude O'Keefe sign the document herein referred to as Exhibit 2A with her signature, to-wit: Bessie C. Murphy, and further she did not then and there immediately declare in the presence and hearing of both said Annie L. Carney and said Gertrude O'Keefe that the instrument herein referred to as Exhibit 2A was her will and that she wanted said Annie L. Carney and said Gertrude O'Keefe to then and there sign the same as witnesses thereto, and further the said Annie L. Carney and Gertrude O'Keefe did not then and there in the presence of the decedent Bessie C. Murphy and of each other after such signing by the decedent Bessie C. Murphy, sign said instrument designated as Exhibit 2A as witnesses thereto as follows, to-wit: Annie L. Carney and Gertrude O'Keefe.
"20. That said purported will of decedent here known as Exhibit 2A is not the will of decedent."
The proponents vigorously contend that all of the elements of due execution were conclusively established  namely, the authenticity of the decedent's signature, the subscription (the actual signing of the will by the witnesses), and their attestation (that they signed at decedent's request after witnessing her signature and in the presence of the decedent). They further contend that Mrs. O'Keefe's testimony was in no manner directly contradicted by the testimony of any other witness or by any reasonable inferences that could be drawn from the evidence, insisting that the only impeaching evidence was remotely circumstantial or from a wholly unreliable source.
Objectors at trial and here insist that the resolution of the decisive issue depended solely upon the veracity of Mrs. O'Keefe's testimony and that both the jury and the court found it untrue and accordingly were justified in disregarding it as proof of proper execution.
1. As part of their argument that the evidence of due execution was "positive, undisputed, and conclusive," proponents argue that the trial court "applied an erroneous rule of law" in weighing the evidence. It is urged that, since there was proof of the genuineness of the decedent's and the witnesses' signatures, a presumption of due execution *401 should have been applied, thereby placing upon contestants the burden of going forward with the evidence to rebut the presumption by clear and satisfactory evidence of want of due execution.
We have recognized and consistently applied this well-established principle of the law of wills in cases where the testamentary instrument contains an attestation clause.[3] In such cases the presumption not only is given evidentiary force but results in casting the burden of proof to show lack of due execution upon the objector.[4]
To guard against the possibility that an informal instrument possessing testamentary character and containing signatures proven genuine might be rejected because of defective memory or uncertain testimony of an indispensable witness, well-reasoned cases from other jurisdictions have declared that the presumption also arises where attestation is manifested merely by the witnesses signing, whether or not so designated on the instrument.[5] So far as we can ascertain, we have not yet passed upon this question, the difficulties and importance of which are manifest.[6] We decline to do so now because, as objectors correctly point out and as the summary treatment of this point in the briefs confirms, the issue was neither presented to the trial court nor properly assigned as error in this court. The jury's and the court's decisions were governed by the rule that the proponents *402 had and retained the burden of proof, and upon this review we are obliged to accept it as the law of the case.[7]
The minimal essentials for due execution of an instrument offered as a will are well established. The language of § 525.18, subd. 1, and the language of attestation clauses commonly used would lead one to believe that a testator must assemble the witnesses, declare the instrument to be a will in their presence, and thereupon sign it in their presence, followed by the witnesses signing in the physical presence of the testator and each other. Even though such formalities desirably emphasize the solemn nature of executing a will, our decisions clearly indicate that the witnesses need not be made aware that the instrument is a will,[8] nor observe the testator signing the instrument,[9] nor attest his signature by signing in the presence of each other.[10] All that is required as a minimum is that the testator either sign the instrument in the presence of the witnesses or declare to each that the signature appearing was made by him and that the witnesses attest such signature by signing the instrument in the presence of the testator.[11]
As is apparent from the record, especially the arguments of counsel, the form of the interrogatory, and the court's instructions, the decision was predicated upon the theory, accepted by all parties, that the proponents were required to prove every formality of execution described in the interrogatory, including publication. This undoubtedly explains the form of Finding No. 19, embracing as it does the negative of a summary of Mrs. O'Keefe's testimony. We agree with proponents that a reading of this finding does not disclose how the court resolved the disputed facts concerning whether either decedent's or Mrs. Carney's signature was forged  factual disputes upon which the testimony was in irreconcilable conflict. Nor can we *403 be certain that resolution of these disputes was intended by Finding No. 20. This finding may have been intended to resolve the disputes over whether the instrument lacked testamentary intent, amounting to no more than a memorandum of decedent's intention to make a will, or whether publication was lacking; or it may have been simply a logical conclusion of law from Finding No. 19. The court's explanatory memorandum, not made a part of the findings, does not supply the omission to find the facts essential for the purpose of enabling us to review the sufficiency of the evidence to establish the absence of any particular element of due execution. Of the two issues presented, the court regarded forgery as the main issue. Although a specific finding was made that the instrument was "not changed and altered," we can only surmise the court's conclusion concerning forgery. To resolve this issue in objectors' favor would depend in large part upon the acceptance of opinions expressed by the graphologist. Mindful that we are required to give due regard "to the opportunity of the trial court to judge the credibility of the witnesses,"[12] we note that after cross-examination the basis for the opinions she expressed left much to be desired. The court's explanation of the decision was that the evidence was in "approximate balance" and that the proponents failed to sustain their burden of proof of due execution. However, the testimony concerning forgery directly conflicted, and a failure to persuade the court that the signatures were genuine does not resolve the issue. Either the signatures were or were not forged. The significance of deciding this fact dispute against proponents was that it would not only destroy the veracity of Mrs. O'Keefe's testimony but alone would compel a rejection of the instrument. Because of the critical nature of this issue, our rules of procedure require a responsive and specific finding to enable us to determine its evidentiary basis.[13] It is obvious that a most favorable view of the findings and explanatory memoranda could support an inference that the court found Mrs. O'Keefe's testimony to be false and perhaps also *404 that the signatures were forged, findings which, if made, we believe would have evidentiary support. We would not hesitate to draw an inference that Mrs. O'Keefe's testimony was rejected as false were we satisfied that the court did not inadvertently relinquish its factfinding responsibility to the advisory jury, thereby making it unnecessary to resolve the factual disputes concerning forgery, the testamentary character of the instrument, and the truth or falsity of Mrs. O'Keefe's testimony. After observing in his memorandum accompanying the findings that the jury's answer to the first interrogatory was justified by the evidence, the court stated:
"* * * It is true that they could just as well have answered it to the contrary. For [the] court under these circumstances to disregard that finding would justifiably appear to be an unwarranted and unreasonable assumption of power. The court was not bound to submit the question, but it did, and common sense demands that it should honor and adopt the jury's finding as to the first interrogatory as its own, and it consequently does adopt that finding as its own finding.
"* * * This was a high class, intelligent jury, and its answer should not be lightly disregarded. Otherwise, why should the rules provide for or sanction such a jury, if the judge is to pay no attention to its findings?"
2. Rule 39.02 permits an advisory jury to be impaneled in a case such as this, but Rule 52.01 expressly provides that the court has the responsibility for finding the facts. As the name of such jury implies, it is only to advise the court and its findings are merely to reinforce the court's own decision on the disputed facts  not to supplant it. For the court to relinquish its duty to find the facts to an advisory jury directly conflicts with the rules since the jury's verdict is to be given "the same effect as if trial by jury had been a matter of right" only if the parties so consent prior to submission of the case.[14]
*405 The record shows that the court ordered an advisory jury upon objectors' motion but without the consent of proponents at a time when it appeared that the trial would involve all of the issues raised by the pleadings. Such action by the court was not only proper but wholly consistent with the common practice in will contest cases, especially where the issues of testamentary capacity and undue influence are to be presented. The record also shows that the proponents met with no success in their attempts to narrow the issues by discovery procedures and by challenging the adequacy of the pleadings prior to trial. Consistent with his pleadings, objector George F. Murphy persisted to the time of taking testimony in claiming that the issues of testamentary capacity and undue influence were in the case, even though he offered no evidence thereon. At the conclusion of the trial, proponents, prompted no doubt by their claim that only the issue of due execution remained, made unsuccessful efforts to have the court dismiss the jury. Apparently no assistance was given to the court in framing interrogatories which could have required specific answers to the facts in dispute  perhaps because counsel had in mind that our rules of procedure were intended to change the former practice of giving binding effect to a jury impaneled without the consent of the parties. Moreover, Finding No. 19 is essentially the same as the interrogatory submitted, the answer to which the court adopted as its own. We cannot conclude, as the court did in In re Estate of Healy, 243 Minn. 383, 388, 68 N.W. (2d) 401, 404, that 
"* * * [t]he verdict is worded quite differently from the finding and it is evident that the court intended to and did make its own finding * * *."
We are constrained to conclude, as proponents contend, that when the findings were made, the court, contrary to the rules, placed undue reliance on the jury's verdict. Following the hearing on the post-trial motions, during which the role of an advisory jury apparently *406 was discussed, the court acknowledged that the jury's verdict was not binding on it and took pains to declare full responsibility for the findings and decision. As the findings were not changed in any particular, this explanation is not persuasive of an independent resolution of the narrow, disputed issues of fact presented by the evidence.
Finally, we observe that Finding No. 19 contains errors of fundamental law. Because these defects were not asserted until appeal to this court, they alone could not serve as reversible error. However, it is a fact that the interrogatory, the arguments of counsel, and the court's charge all were based upon the erroneous assumption that due execution required publication as well as that attestation and subscription must be accomplished in the presence of the testatrix and both witnesses. Even though the interrogatory was consistent with proponents' testimony, these errors may well have improperly influenced the jury and the court to proponents' prejudice.[15] These facts serve to reinforce our conclusion that a new trial must be granted. Although we might remand with directions to the trial judge to make specific findings, we believe that he should not be reconfronted with having to decide the fact questions presented after we have indicated our view as to the sufficiency of the evidence in support of objectors' contentions. Further, because the jury's verdict was predicated upon errors of law, the assistance of the jury in resolving the issues upon this record is difficult, if not impossible, to evaluate.
Reversed and new trial granted.
OTIS, JUSTICE (concurring in part and dissenting in part).
The subject of this litigation is a soiled, undated sheet of ruled paper containing the following cryptic penciled notations written in the hand of decedent's sister, Nell Steiger:
"This House and Store to you Nell and Betty or survivor, and 1.00 to Tommy Murphy 1.00 to Jean and rest divided between Nell *407 Steiger, and  okeefe children  Donald, Gordon  Geo  Jimmie, Betty  John  House at 305 N. 10 st. Nell and Betty  Key
 "Bessie C. Murphy
 Annie L. Carney
 Gertrude O'Keefe"
The writing contains no clue as to whose property is being described; no intention to make a testamentary disposition is expressed; and nothing suggests which one or whether all three signators intended to be the testatrix. Proponents seek to elevate this document to the dignity of a will designed to dispose of an estate of $220,000.
The wife of a legatee has testified to its valid execution. However, the trial court and an advisory jury have apparently rejected that evidence as unworthy of belief. The majority seem to echo this evaluation by stating there is support in the record for the witness' impeachment. The fact she remained mute while her husband, the special administrator, conducted a month-long search to determine whether a will had been executed is, to say the least, persuasive proof of the unreliability of her testimony.
The majority charges the trial court with avoiding its factfinding responsibility. This is a characterization from which I respectfully dissent. The Rules of Civil Procedure and our own decisions authorize the court to use the jury exactly as it did. In Wormsbecker v. Donovan Const. Co. 251 Minn. 277, 87 N.W. (2d) 660, the trial court made findings on the basis of the jury's answers to certain interrogatories. There the court stated (251 Minn. 284, 87 N.W. [2d] 665):
"* * * We can find no cause for complaint on this score. But if anything improper existed in that connection, it is immaterial in view of the fact that the court, in addition to adopting the answers of the advisory jury, also found the same facts on the evidence."
Again, in Johnson v. Johnson, 256 Minn. 33, 39, 97 N.W. (2d) 279, 284, where the court accepted as its finding the amount of attorneys' fees determined by an advisory jury, we stated:
*408 "* * * Furthermore, the jury acted in an advisory capacity only, and the court was free to accept or reject the verdict as it saw fit."
Finally, in Hornof v. Klee, 259 Minn. 139, 143, 106 N.W. (2d) 448, 451, we held:
"* * * It was a fact issue; the jury found for the plaintiffs; and the court adopted the verdict in its findings. In our opinion the finding is sustained by the evidence."
In re Estate of Healy, 243 Minn. 383, 68 N.W. (2d) 401, which predates these three decisions, does not expressly prohibit the trial court from adopting the jury's verdict in its findings. That case merely requires that the record make clear that the decision is the court's and not simply the jury's. The fact the court departed from the wording of the verdict was there found to be evidence of the court's independent determination. I submit that the instant case is even stronger because of the court's complete rejection of one of the two verdicts rendered by the jury.
The authorities elsewhere are in accord.
"* * * The responsibility for decision still remains with the judge. He must prepare findings of fact and conclusions of law when he uses an advisory jury and his exercise of discretion in accepting or rejecting the verdict of the advisory jury is not subject to review." (Italics supplied.) 2B Barron & Holtzoff, Federal Practice and Procedure (Rules ed.) § 891, p. 64.
"* * * the verdict is advisory only, that the court may accept it or reject it in its unfettered discretion, * * *." Id. p. 65.
See, also, Wright, Minnesota Rules, p. 244.
The action of the trial court in the instant case is further supported by the rule suggested in 5 Moore, Federal Practice (2 ed.) § 3910 [3]:
"* * * The trial court may, of course, believe that the advisory verdict represents a correct result and make findings in accordance therewith. And at times unusual circumstances may strongly impel the trial court not to reject the jury's advice."
*409 These conclusions are based on a number of Federal decisions interpreting Rule 39(c), Federal Rules of Civil Procedure, which is substantially identical with Rule 39.02, Minnesota Rules of Civil Procedure. In Greenwood v. Greenwood (3 Cir.) 234 F. (2d) 276, the court ruled that a motion to set aside an advisory jury's answers to interrogatories was in effect a motion to amend findings under Rule 52(b), which is equivalent to our Rule 52.02. In so holding the court stated (234 F. [2d] 278):
"* * * Here the court entered judgment `on the basis of the answers of the jury to said interrogatories. * * *' Although a trial court is in no way bound by the answers of an advisory jury, it may adopt the jury's findings as its own."
It is quite proper to use an advisory jury "to relieve the conscience of the court," as the trial court noted, or as Judge Charles Clark said in (American) Lumbermens Mutual Cas. Co. v. Timms & Howard (2 Cir.) 108 F. (2d) 497, 500, "to have its `conscience enlightened.'"
In its first memorandum the trial court did not indicate it felt bound by the advisory verdict, but, on the contrary, completely rejected the jury's answer to the second interrogatory. Its acquiescence in the remainder of the verdict, I submit, falls far short of relinquishing judicial responsibility. The court quite sensibly observed that a judge may properly be influenced by the verdict of an intelligent jury and that it would be pointless to impanel one if it were to serve no useful purpose.
Although in their written motions for amended findings and for a new trial appellants made no claim that the court improperly relied on the verdict, the issue was apparently raised at the hearing. For the court thereafter prepared a second memorandum in which it unequivocally indicated in unmistakable language the process by which it reached a decision.
"* * * [T]he court must make its own findings of fact and conclusions of law and is not bound by the findings of any advisory jury that has been impaneled. * * * This court here clearly understood *410 that it had a duty to and did make its own findings of fact, and it understood that it was not bound by the findings of the jury, as is illustrated by its failure to follow the jury on its answer to the second interrogatory.
"* * * Assuming for the sake of argument that there had been no advisory jury, then the contentions of the proponent on the one hand and of the objectors on the other hand would have stood in an approximate balance.
"However, an advisory jury was called, and it answered the first interrogatory in a way that left no question but that it found the story told by Gertrude O'Keefe, one of the alleged attesting witnesses, to be untrue. * * *
"The court frankly admits that it gave serious and painstaking consideration to the advice which the jury gave to it in the answer to the first interrogatory. The makers of Rules 39.02 and 52.01 MRCP assuredly must have expected the trial courts to consider such findings of fact and not to arbitrarily ignore them, or the rules would not have provided for such an advisory jury. Accordingly, this court when it drew its findings, and when it drew the order hereto attached, carefully considered all of the evidence received at the trial, the arguments of counsel at the trial and again when these motions were considered, the rules of law as to burden of proof in particular, other applicable rules of law pertinent to such matters and the answers of the jury to the interrogatories submitted to it. It then came to its own conclusions as to what the findings of fact and conclusions of law should be and drew them accordingly." (Italics supplied.)
In view of the trial court's unqualified disclaimer of blind reliance on the jury and its obvious independence in rejecting one of the two verdicts, I am at a loss to understand the reason for the majority's position that the judge did not perform his duty.
This is a case which has been heard for a full week by an experienced judge and twelve qualified jurors. Sixteen witnesses were called and nearly fifty exhibits introduced. The record covers over 500 pages. All that remains is to secure from the trial court separate findings on matters which it disposed of collectively, reconsidered in *411 the light of the rules which are announced in the court's opinion and with which I am in agreement. Nevertheless, the majority elects to subject the litigants to the further delay and expense of a full-dress rehearing. By denying the judge the opportunity to clarify his decision we intimate, without any foundation, that he is either unwilling or unable to comply with our mandate. Judge Griffin B. Bell of the Fifth Circuit recently considered a similar problem in Aetna Ins. Co. v. Paddock (5 Cir.) 301 F. (2d) 807, 810, and had this to say:
"Appellant confounds the appeal by failing to give proper recognition to the role of an advisory jury in an equity case, the rules obtaining to the use that may be made of the jury verdict by the court, and the manner in which exception may be taken to the verdict. Rule 39(c), Fed.R.Civ.P., provides that in actions not triable of right by a jury the court may try any issue with an advisory jury. In an equity matter the court may submit to the advisory jury such issues of fact as it sees fit and may adopt the findings, * * * or disregard its findings, all in the discretion of the court. * * * Some of the findings of the jury may be adopted and others rejected but all findings of the jury must be treated merely as advisory. * * * The remedy where the court has adopted the findings of a jury is not for a new trial but to require the trial court to make independent findings of fact, enter judgment in accordance with those findings, and appeal therefrom." (Italics supplied.)
I respectfully submit that in view of the exhaustive treatment it has already been accorded, justice demands an expeditious conclusion to this litigation. In my opinion the matter should be remanded for further consideration without requiring a new trial.
KNUTSON, CHIEF JUSTICE (concurring in part and dissenting in part).
I agree with the concurring opinion of Mr. Justice Otis. I see no need to impugn the action of the trial judge nor does there seem to be any need for a new trial.
NOTES
[1] Her testimony was to the effect that according to "the best of my recollection" it was signed "not [on] a bare table" but upon either a tablecloth or a magazine and she could not "honestly say it was a tablecloth."
[2] E.g., insufficiency of propositions of law and fact; trial of issues outside the pleadings, e.g., forgery and fraud; failure to discharge jury at the close of testimony; and failure to amend findings or grant a new trial.
[3] In re Estate of Holden, 261 Minn. 527, 113 N.W. (2d) 87; In re Estate of Coleman, 192 Minn. 86, 255 N.W. 481; Lott v. Lott, 174 Minn. 13, 218 N.W. 447; Baxter v. Baxter, 136 Minn. 59, 161 N.W. 261; Hennes v. Huston, 81 Minn. 30, 83 N.W. 439. See, Annotation, 40 A.L.R. (2d) 1223.
[4] See, Baxter v. Baxter, supra; Lott v. Lott, supra; In re Estate of Holden, supra.
[5] Estate of McCarthy, 265 Wis. 548, 61 N.W. (2d) 819; In re Estate of Repp, 241 Iowa 190, 40 N.W. (2d) 607; In re Dalton Estate, 346 Mich. 613, 624, 78 N.W. (2d) 266, 271; Annotation, 76 A.L.R. 617, 622.
[6] All of the cases cited in footnote 3, supra, applied the presumption because of the presence of an attestation clause. In In re Estate of Carlson, 267 Minn. 381, 126 N.W. (2d) 784, the rule could have been but was not urged.
[7] Caballero v. Litchfield Wood-Working Co. Inc. 246 Minn. 124, 74 N.W. (2d) 404.
[8] In re Estate of Holden, 261 Minn. 527, 113 N.W. (2d) 87.
[9] Tobin v. Haack, 79 Minn. 101, 81 N.W. 758.
[10] Gates v. Gates, 149 Minn. 391, 183 N.W. 958.
[11] In re Estate of Liberopulos, 245 Minn. 553, 73 N.W. (2d) 607.
[12] Rule 52.01, Rules of Civil Procedure.
[13] Rule 52.01. See, also, First State Bank v. C.E. Stevens Land Co. 119 Minn. 209, 137 N.W. 1101, 43 L.R.A. (N.S.) 1040.
[14] Rule 39.02. See, In re Estate of Healy, 243 Minn. 383, 68 N.W. (2d) 401; 2 Youngquist & Blacik, Minnesota Rules Practice, p. 324; Wright, Minnesota Rules, p. 244, and Supp. p. 54. See, also, Wormsbecker v. Donovan Const. Co. 251 Minn. 277, 87 N.W. (2d) 660; Hornof v. Klee, 259 Minn. 139, 106 N.W. (2d) 448; Bade, Jury Trial in Will Cases in Minnesota, 22 Minn. L. Rev. 513.
[15] Cf. In re Trust under Will of Holden, 207 Minn. 211, 291 N.W. 104.