Renja SIGURDSON, Appellant,

v.

ISANTI COUNTY, et al., Respondents.

No. C9–84–1138.

Court of Appeals of Minnesota.

Feb. 26, 1985.

Review Granted May 1, 1985.

David A. Singer, Singer & Singer, Minneapolis, for appellant.

Richard A. Beens, Stefen, Munstenteiger, Beens, Parta & Peterson, Anoka, for respondents.

Heard, considered, and decided by LESLIE, P.J., and WOZNIAK and LANSING, JJ.

## OPINION

WOZNIAK, Judge.

This is an action by Renja Sigurdson against Isanti County, Aaron Boettcher, and Frank Mennenga, alleging sex discrimination in employment practices in violation of Minn.Stat. § 363.03, subd. 1(2)(c). Sigurdson alleges the County Assessor's office discriminated against her, on the basis of sex, in their hiring practices and in their promotion and advancement policies as compared with male co-worker Curtis Becker. The appellant further claims that she was discriminated against in reprisal for bringing charges of discrimination in employment.

The advisory jury by special verdict interrogatories found that the respondents had discriminated against Sigurdson, and that she sustained damages in the amount of $19,500 in back wages and $450 for mental and emotional suffering as a result of such discrimination. The advisory jury further found that the County Assessor's office had not discriminated against Sigurdson in reprisal for bringing charges of discrimination.

The trial court rejected the advisory jury's findings of sex discrimination, denied Sigurdson recovery on any of her claims, and ordered Sigurdson to pay Isanti County $3,600 for attorney's fees. We affirm in part and reverse in part.

## FACTS

Isanti County hired Renja Sigurdson to fill an advertised CETA position of temporary secretary, at a starting salary of $4,884, on February 1, 1975. Sigurdson's duties were clerical in nature, under the direct supervision of Aaron Boettcher, then Isanti County Assessor.

In January 1975, prior to hiring Sigurdson as a temporary secretary, Isanti County had advertised for two additional CETA funded positions for certified property as-

sessors. No appropriate response was received. The County readvertised in August, and Curtis Becker (with whom Sigurdson claimed throughout the trial that she should be compared) and Duane Johnson were hired. Neither was a certified assessor, but the County needed to fill the positions and decided to hire the applicants with the highest qualifications available. Both had college degrees, the necessary farm backgrounds, and knowledge of rural buildings and values. Little additional training was required and both became certified assessors in early 1976. Sigurdson *did not* apply for either assessor position. Furthermore, even if she had applied, she would not have met the CETA requirement of being unemployed for at least 30 days prior to application.

All department employees were given like educational opportunities at the County's expense. Sigurdson requested and was allowed to attend thirteen courses and seminars from 1975 through 1983. She became a certified assessor in December of 1976, and although she has completed the requisite course work, has never written the final paper necessary to become an accredited assessor.

Sigurdson requested to do field appraisal work between December 1976 and June 1979. Her requests were denied because the office had no need for additional field appraisers.

In the spring of 1979, a male employee quit the Assessor's office, freeing up computer and appraiser work. At a staff meeting in June, Aaron Boettcher requested assistance with those responsibilities. Sigurdson precipitated an argument with Boettcher and, in no uncertain terms, refused such advancement, cleared out her desk, and left the premises. Boettcher assumed she had quit. Sigurdson claimed that she did not quit.

In July 1979, after negotiations with the County Board, Sigurdson was reassigned to the Assessor's department. During the July 1979 field appraising season, the first season after the male employee quit, Sigurdson and another female employee were assigned field work in addition to their regular office duties. This was the first opening for additional appraiser work since Sigurdson became certified in 1976. No employee, male or female, was upgraded ahead of Sigurdson.

On September 17, 1979, Boettcher issued a written reprimand to Sigurdson. Boettcher testified that he issued the reprimand because Sigurdson had continually been asking him questions such as: "Why are you treating me different than the other people?", and "Why aren't you satisfied with my work?" In the reprimand, Boettcher instructed Sigurdson to put her complaints about the office in writing. Boettcher testified that the complaints stopped after the reprimand.

During 1978 and 1979, Isanti contracted through the Minnesota Association of Counties to classify and evaluate all county employees to establish job classifications and set salaries. Sigurdson was classified as an Appraiser Trainee. Curtis Becker, who had been doing field appraisal work since 1976, was classified as a Property Assessor.

A Cease and Desist Order froze all promotions in May 1979. Union Local 320 was certified to represent the county courthouse employees. *Under the union contract,* effective March 1980, Sigurdson was classified as a Property Appraiser and was compensated retroactively back to mid-1979. Curtis Becker was classified as a Deputy Assessor, reflecting superior education, training, experience, and ability which accounted for a pay differential.

Aaron Boettcher retired in June 1981. Both Sigurdson and Becker applied for the position of County Assessor. An outsider, Frank Mennenga, a former Deputy Assessor with administrative experience and two college degrees, was hired. He was clearly the best qualified candidate for the job.

Shortly thereafter, in August 1981, Mennenga considered recommending Sigurdson for reclassification as a Deputy Assessor. In county government, an individual is considered for a deputy position when the head

of the department has determined that that person is qualified to act in his stead, and is not only familiar but supportive of the policies of the department, and can be trusted to do in the absence of the department head what the department head would do if he were there.

Mennenga dismissed this consideration soon thereafter. In a meeting between Sigurdson, Mennenga, and Caroline Drude, Executive Secretary of the County Board and Personnel Director, Sigurdson indicated that if she were named deputy she would follow the policies of the department that she agreed with and which she felt were in the best interest of the County. She would not indicate that she would support department policy set by Mennenga. Additionally, Sigurdson was involved in several work-related incidents which required Mennenga to reassign her duties—transferring her field appraising assignment from one section to other sections. Sigurdson disobeyed these instructions.

In December 1981, Sigurdson again violated Assessor's Office rules, this time entering a taxpayer's home without permission. Sigurdson's actions resulted in an explosive incident between the taxpayers and County officials. The taxpayers threatened to sue the County for breaking and entering and trespass. Mennenga and Drude managed to appease the taxpayers. Consequently, Sigurdson was reassigned to desk duty to review and study the Minnesota Assessor's manual and the applicable taxation statutes. Mennenga felt that perhaps Sigurdson was unfamiliar with the manual and the statutes—complex documents which had recently been updated. Sigurdson took offense, rejected these instructions, and went about other office matters. A written reprimand was filed. After continued disobedience, another letter of reprimand was sent to Sigurdson.

Sigurdson filed a union grievance, claiming the reprimands were arbitrary and capricious. The grievance was denied. She then filed a charge with the Minnesota Human Rights Commission alleging sex discrimination. The Commission dismissed

the charge after a hearing. An application for rehearing was also denied.

In 1983, Mennenga permitted Becker and Sigurdson to retake course work for completion of a narrative writing, a prerequisite to becoming an accredited Minnesota Assessor. Mennenga conditioned his permission on the employees telling him when their written assignments would be completed. Becker committed himself to 90 days; Sigurdson refused to commit herself at all. Mennenga testified that she told him it was none of his business when she would finish; Sigurdson testified that she might have said that.

The evidence at trial established that Sigurdson's wages increased 211% in eight years—from $4,884 in 1975, to $15,228 in 1983. Curtis Becker's wage increases, from $9,996 in 1975 to $18,864 in 1983, reflect an 88% increase in eight years.

Sigurdson alleged that her ongoing mental and emotional distress was caused by the County's discriminatory treatment of her. Sigurdson's psychologist testified that he had seen her for about five hours, and that she suffered from "depressive reaction with paranoid ideation." Also that "her condition is directly related to discrimination at her job." The psychologist admittedly had not taken into consideration Sigurdson's inherent personality traits, her husband's diabetic condition, her son's recent surgery, or her own surgery. He did admit that her psychological profile is markedly abnormal. The trial court dismissed this testimony as being unfounded and unworthy of evidentiary consideration.

The former County Assessor, Aaron Boettcher, testified at trial that he did not like sending ladies out in cars after it had snowed overnight. Further, he testified that he thought it was a bad public image for a woman and a man to go out together to appraise property. Virginia Loren, a comparably situated female employee in the County Assessor's office, denied any awareness of sex discrimination.

Virtually everyone who either worked with or supervised Sigurdson from 1975 through 1983 testified at this trial. Sigurd-

son's allegations were unsupported by any testimony other than her own.

## ISSUES

1. Did the trial court err in concluding that Isanti County did not discriminate against Sigurdson, on the basis of her sex, in violation of Minn.Stat. § 363.03, subd. 1(2)(c)?

2. Did the trial court err in determining that the County Assessor's office did not take reprisals against Sigurdson for exercising her rights under the union contract or the Minnesota Human Rights Act?

3. Did the trial court err in awarding attorney's fees to Isanti County?

## ANALYSIS

### Scope of Review

■ An advisory jury may sit in a discrimination case, but the court has final responsibility to find the facts. Minn.R. Civ.P. 39.02, 52.01. The court is not bound by the advisory jury's determination of the fact issues submitted. *In re Estate of Murphy*, 269 Minn. 393, 131 N.W.2d 220 (1964). If the facts are submitted to an advisory jury, the trial court must make its own findings of fact. The court is not bound by the advisory jury's determination of the fact issues submitted. If the court desires to incorporate the jury's findings, it must make them as findings of its own. *Murphy* at 404, 131 N.W.2d at 227. As the name of such jury implies, it is only to advise the court.

■ Thus, the scope of review in this case is whether the evidence as a whole fairly supports the findings of the lower court, and whether those in turn support its conclusions of law and judgment. The trial court result should be reversed where the result is clearly erroneous in the sense that it is manifestly contrary to the weight of the evidence. *Carlson-Lang Realty Co. v. City of Windom*, 307 Minn. 368, 240 N.W.2d 517 (1976). Due regard should be given to the opportunity of the trial court to judge the credibility of the witnesses.

*State v. Paulson*, 290 Minn. 371, 188 N.W.2d 424 (1971).

### I.

The Minnesota Human Rights Act provides, in pertinent part, as follows:

Subd. 1, Employment. Except when based on a bonafide occupational qualification, it is an unfair employment practice:

■ For an employer, because of race, color, creed, religion, national origin, sex, marital status, status with regard to public assistance, membership or activity in a local' commission, disability, or age

(c) To discriminate against the person with respect to his hire, tenure, compensation, terms, upgrading, conditions, facilities, or privileges of employment.

Minn.Stat. § 363.03 (1982).

■ By this authority, individuals may redress alleged grievances in the civil courts when such claims have not been resolved through the union contract dispute procedure or charges filed with the Human Rights Commission.

■ In a contested case, the plaintiff must make a prima facie showing of sex discrimination as defined by Minn.Stat. § 363.03, subd. 1(2)(c). The employer may then establish legitimate, nondiscriminatory reasons for the action, and the charging party must show that the reasons stated are a mere pretext for discrimination. *State by Gomez-Bethke v. Office of County Auditor*, 347 N.W.2d 541 (Minn.Ct.App. 1984), citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

Renja Sigurdson alleges that the County Assessor's office discriminated against her, on the basis of sex, in their hiring practices and in their promotion and advancement policies. The court was aware of the *McDonnell-Douglas* analysis inasmuch as its instructions to the advisory jury included these steps. While the trial court did not specifically refer to this analytic process in its findings, it is clear that the court

used this three-step process to arrive at its decision.

## A. *Hiring Practices*

■ Sigurdson was hired under a CETA entry level clerical position and paid a salary of $4,884 per year beginning February 1, 1975. The Assessor's office advertised for a Certified Deputy Assessor in January and August; two assessors were hired in September and paid a justifiable different salary of $9,996 per year. Both had college degrees, extensive farming backgrounds, and knowledge of rural buildings and land values. Sigurdson had neither a college degree nor extensive farming experience. Furthermore, Sigurdson did not even submit an application for the assessor position. And, even if she had applied, she could not have been chosen as she was employed at the time—she could not have met the CETA unemployment requirement.

The County Assessor's office did not discriminate against Sigurdson in not hiring her as an assessor as she neither applied nor was qualified for the position. The Assessor's office properly selected the candidates most qualified for the job.

## B. *Promotion and Advancement Policies*

By December 1976, Sigurdson had attended sufficient employer-sponsored educational and training courses to be granted a Minnesota certified assessor's license. Although the County Assessor did not assign Sigurdson to outside work immediately, she and a female co-worker were assigned to the Assessor's Department's first vacancy in August 1979. This opening was created by the resignation of the deputy assessor on June 1, 1979.

■ The dissent argues that a deputy assessor position should have been created for Sigurdson upon her certification in December 1976. This argument is in error in that the County is under no obligation to create a new position, with a corresponding pay differential, merely because an employee enhances her credentials.

■ The trial court found that the County granted Sigurdson the first appraising position to become available after her certification:

### XII

That on July 19, 1979, after her request in negotiations with the County Board, Plaintiff Renja Sigurdson, was reassigned to the Assessor's Department. During the next field assessing term, fall of 1979, Plaintiff was assigned with Virginia Loren, both Certified Assessors, to do outside appraisal work, complimenting their regular office duties. This being the first opening for additional field appraisal work within the Defendant Isanti County Assessor's Office, since the Plaintiff Renja Sigurdson, became certified in December, 1976, created by the Deputy Assessor's departure

This finding is supported by the record. There is no evidence that any other employee was upgraded ahead or around Sigurdson.

### II.

The Minnesota Human Rights Act prohibits reprisals:

Subd. 7. Reprisals. It is an unfair discriminatory practice for any employer * * * or employee or agent thereof to intentionally engage in any reprisal against any person because that person:

1. Opposed a practice forbidden under this chapter or has filed a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

Minn.Stat. § 363.03 (1982).

■ With respect to Aaron Boettcher's term as County Assessor, Sigurdson has shown no actions that could constitute reprisal. From 1975 through Boettcher's retirement in 1981, her salary increased from $4,884 to $12,304 per year. She received her requested promotion to field appraisal work at the first available opportunity in the summer of 1979.

With respect to Frank Mennenga's term as County Assessor, Sigurdson argues that the two written reprimands given to her in late 1981 were, in fact, reprisals for having filed a Human Rights complaint and a union grievance.

The reasons for these reprimands were testified to at great length by both Mennenga and the Executive Secretary of the Isanti County Board, Caroline Drude. Drude's duties include acting as personnel director for the County. Contrary to Assessor's Office rules, Sigurdson entered a taxpayer's home without permission. An explosive situation developed when the taxpayer came to the Assessor's Office to complain. The situation was only smoothed over by the intervention of Drude, Sigurdson's second written reprimand resulted from her direct refusal to follow reasonable directions and office policies.

The appropriateness of the reprimands was buttressed by the testimony of Tom Schibilla. As union steward, he took Sigurdson's grievance of the reprimands to Caroline Drude. When Drude refused to alter or withdraw the reprimands, Schibilla, on behalf of the union, elected to proceed no further with the grievance. This was done in spite of the fact that additional avenues of appeal were available under the union contract.

Any disciplinary actions taken against Sigurdson were for just cause. The mere fact that she filed a grievance and a complaint under the Minnesota Human Rights Act did not make her immune from the duty to observe office rules and practices.

### III.

■ The trial court may, in its discretion, award attorney's fees to the prevailing party in a Human Rights suit:

Subd. 3: Attorney's fees and costs. In any section or proceeding brought pursuant to this section the court, in its discretion, may allow the prevailing party, oth-er than the department, a reasonable attorney's fee as part of the costs.

Minn.Stat. § 363.14 (1982).

Though the award of attorney's fees was relatively nominal, in view of the circumstances of this case and the decision of the advisory jury partially in Sigurdson's favor, we reverse.

### Conclusion

This court is well aware of former County Assessor Aaron Boettcher's seemingly sexist attitude, as reflected in his testimony:

I just didn't like the idea of sending ladies out with a car when it snowed overnight, it was cold and windy and I just—it would have hurt me to do that. I didn't mind [a woman] riding out with me, but if I was to work with one for three months out of the year, every day, I guess I wouldn't have appreciated too much.

Notwithstanding these feelings, words were not transformed into actions. Initially, as temporary secretary, she simply was not qualified for a position she did not seek. After becoming qualified, she still was not inequitably denied an assessing position—there simply was no assessing job available at that time. At no time was any person advanced ahead of her. As the trial court noted:

The advisory jury erred in its findings that Plaintiff Renja Sigurdson should be compared with fellow employee Curtis Becker, and hence compensated with like salary in years 1976 to 1983. The employee Curtis Becker was hired to fill employer's need of an advanced position not at entry level, but with possessed credentials, education, college degree with teaching and Principal experience, farm background and knowledge of rural buildings and values, and was unemployed to fill CETA requirements. As evidenced, Curtis Becker, was even tempered and experienced in management skills and computer knowledge, with the added ability to take and follow di-

rections; many of which the Plaintiff has not demonstrated, even to this date.

The record strongly supports this finding. Sigurdson chooses to ignore that she was originally hired at an entry level position while her supposed male counterpart was hired at an advanced position for which he was well qualified. Her economic advancement has been substantial when compared to her alleged male counterpart, Curtis Becker.

The record in this case does not contain any credible evidence to support Renja Sigurdson's claims of sexual discrimination. The trial court found and the record reflects that she was an extremely difficult employee to supervise. It reflects evidence of Sigurdson's disruptive behavior—her continued pattern of questioning office policies, her deliberate disregard of directives.

We are concerned with employment equity for all men and women, regardless of race, creed, color, or sex. With employment equity, however, lies a corresponding duty of tolerance and acceptance of management decisions that apply to all employees. Some management decisions are not, to an individual employee's rationale, very enlightened, correct, or fair; but, if applied uniformly, such decisions cannot substantiate a discrimination claim.

## DECISION

The trial court's findings are not clearly erroneous in finding that the Isanti County Assessor's office did not discriminate against a female employee in violation of Minn.Stat. § 363.03, subd. 1(2)(c), in not hiring her for an assessing position, as she neither applied nor was qualified for the position. And, further, that the County did not discriminate against her in its promotion and advancement policies.

The trial court's ruling that two written reprimands given to female employee for disobeying office directions and policies did not constitute reprisals against that employee for exercising her rights under her union contract and the Minnesota Human Rights Act was supported by the evidence.

A nominal award of attorney's fees to the County was not appropriate under the facts of this case.

Affirmed in part; reversed in part.

LANSING, J., dissents.

LANSING, Judge (dissenting).

I dissent from that portion of the majority opinion holding that appellant was not discriminated against in the promotion and advancement policies of the Isanti County Assessor's office. The facts presented at trial were essentially undisputed. A number of these relevant facts are omitted from the majority opinion and the trial court's findings. Other facts are presented in a light that is not fairly representative of the evidence. Consequently, a fuller fact statement is necessary.

## FACTS

The Isanti County Assessor's office had few employees when Renja Sigurdson was hired in February 1975. Aaron Boettcher was the county assessor. His son, Dean Boettcher, was the deputy assessor. Annette Bellin, another relative of Boettcher's, was the clerk. Neither of the Boettchers had a college degree.

In October 1975 Curtis Becker and Duane Johnson were hired as appraisers. Becker had a degree in parochial school teaching; Johnson had a degree in social work. Neither of them had any experience in assessing. Although Sigurdson had assessing experience by that time, she was not notified of the job openings. Boettcher testified that he hired Becker and Johnson because of their farming and educational backgrounds, although he admitted that a college degree was not a requirement for the position. He also knew that Renja Sigurdson and her husband lived on a farm and that she had college credits which he estimated were equivalent to two years of college attendance.

After Becker and Johnson were hired, they performed the same work as Sigurdson but were occasionally taken along to do field work with the Boettchers. As soon as

they were certified in early 1976 they were made deputy assessors, and Dean Boettcher was promoted to chief deputy assessor. Virginia Loren, a certified assessor, was also hired in October 1975 to do part-time office work.

Sigurdson became a certified assessor in December 1976. She repeatedly asked to do field work from that time through June 1979. Aaron Boettcher denied those requests. He also denied her requests for computer training on the recently installed computer system, although he allowed Becker and Johnson to be trained on the computer. Duane Johnson left the office in April 1976 to accept a social work position with Nicollet County. No one replaced him as a deputy assessor.

Aaron Boettcher testified that "deputy assessor" was the job description used for anyone who did field work. He further testified that everyone in the office did essentially the same work except for three months in the fall when the field work was performed.

Sigurdson and Boettcher had no problems getting along until June of 1979. Dean Boettcher had quit, and at a staff meeting Aaron Boettcher announced his intention to hire two men to replace Dean. Sigurdson asked why he would do that when "there were two women in the office willing and able to do the work" (Virginia Loren and herself). She testified that his response was "assessing is no job for a woman" and "his wife wouldn't like it if he went out in the country with a woman." At trial Boettcher testified that he did not recall his responses to her question. Curtis Becker also said at the meeting that his wife wouldn't like it either if he were to drive around with a woman.

Boettcher then asked the women if they would be willing to do the computer work that his son had formerly done. Sigurdson said, "That's funny, I was never good enough for it before," referring to his prior denials of her requests for computer training. He became angry, thought she was trying to "make a fool" out of him, and told her to get out of the office if she didn't

like it there. He showed her the door. Sigurdson took her purse and left for the day. She did not clean out her desk.

The next day she returned and was told that Boettcher would be out of the office for a week. She did not know whether she was fired or not so she told a secretary that she would take vacation time for the rest of the week. She straightened out her desk but left personal effects there. When she returned the following Monday, her desk and telephone were gone. Boettcher told her that as far as he was concerned she had quit and that he would see that she did not qualify for unemployment benefits.

In July 1979 Sigurdson was notified that she could return to her job. No one ever explained to her why the County had changed its position about her termination. Boettcher asked her to sign a typed statement that she would perform all her job duties and do certain tasks. She refused because no one else was asked to sign a similar statement. Boettcher became angry, left the office, and came back with a county judge to witness Sigurdson's "insubordination." The judge refused to get involved. Sigurdson never got her typewriter back, and it took a year and a half to get a telephone. However, Boettcher allowed her to begin doing field work.

In the spring of 1979 Sigurdson had received Boettcher's permission to attend a course in the fall. The day before the course was to begin, Boettcher told her she could not attend. She told him that he was being unfair and was "a chauvinist from way back." This is the "name-calling" incident for which she was reprimanded.

When the union contract became effective in March 1980, Sigurdson was classified as a property appraiser, the same job title Becker had when he had been initially hired with no experience. Becker was classified as a deputy assessor. According to a union agent, Boettcher had the ultimate responsibility for assigning employees to specific job classifications under the union contract. Sigurdson brought her first complaint to the Minnesota Human Rights Department in October 1980. In April 1981

Boettcher retired. Frank Mennenga re-placed him as county assessor in June 1981.

In August 1981 Mennenga evaluated the job classifications of his employees and wrote on a classification report that Sigurdson should be reclassified to deputy assessor. He listed in that report what he thought were the qualities a deputy assessor should have and stated that Sigurdson had those qualities.

He became aware of her human rights complaint in the fall of 1981. That fall he began rebuking Sigurdson for coming to work a few minutes late. He docked her pay when she left work for a doctor's appointment. He called her a trouble-maker. All the office employees who testified said the office rules were lax regarding the time to begin work in the morning, that most people came in a few minutes late, and that Sigurdson was not late more frequently than anyone else. Another office worker testified that under the union contract employees could not be docked for leaving the office to see a doctor.

That fall Mennenga reassigned Sigurdson to a different area of the county because Aaron Boettcher's relatives did not want her to appraise their property. The first day that she was assigned to work in the new area, the office secretary notified her by telephone that a resident in her old area had requested an afternoon appointment. Sigurdson had previously been to the property and asked the resident to contact her for an appointment. She was unsure whether she was supposed to follow up on her prior calls, and the secretary told her Mennenga was not available to ask. Since she was near the area, she went to the property and appraised it. When she returned to the office, Mennenga accused her of intentionally disobeying his orders.

That fall the "explosive incident" to which the majority refers also occurred. Sigurdson went to appraise a home and found that the owners were constructing a new entryway. She rang the doorbell but did not hear it ring inside. Thinking the entryway was not yet connected to the house, she opened the door a few inches and called inside to see if anyone was home. The entryway was connected, and the owners were upset that she had opened the door. Sigurdson later apologized, and even Carolyn Drude, the county personnel officer, testified that she thought the owners had "overreacted." Although it was not the county's policy to enter homes without permission, Minn.Stat. § 273.20 (1981) authorizes assessors to enter buildings to appraise them ("Any officer authorized by law to assess property for taxation may, when necessary to the proper performance of his duties, enter any dwelling-house, building, or structure and view the same and the property therein.")

Sigurdson received her first reprimand from Mennenga on December 7, 1981, based on the above incidents. He characterized her actions as refusing to follow his policies. He told Sigurdson to sit at her desk and read the county manual until further notice. She was not to help with any other office tasks. The manual was 70 pages long, and she sat at her desk reading it for three weeks. When she performed a minor office task that took about 15 minutes, she received her second reprimand from him on the ground that she had refused to follow his orders. Mennenga was asked the following question at trial:

Q: [D]id you feel it would take Renja Sigurdson, in your judgment, for what her abilities are, her intelligence or experience or training, you think it took three weeks to review that [manual]?

A: No.

Sigurdson was not reclassified to deputy assessor, according to Carolyn Drude, because she was not willing to follow Mennenga's policies. There is no evidence that Sigurdson refused to follow any policy other than those upon which the reprimands were based.

In 1983 Mennenga allowed Becker to retake a narrative writing course. A completed paper is not a requirement of the course. The course is intended to prepare certified assessors for writing a narrative report, which is submitted to the State

Board of Assessors for "accreditation." Becker had written the paper once, and the Board had rejected it. He testified that he could use the same data for his second paper and agreed to a deadline because he had already done most of the work. He said it took about 200 hours to complete the paper. When Sigurdson asked permission to retake the course (she had taken it once at her own expense), Mennenga first said there was no money in the budget for it. He then said she could take it if she agreed to a deadline. She refused because she had not yet begun work on the paper.

There were no complaints about Sigurdson's work, other than those described above, since she was hired in 1975. Sigurdson's and Becker's salaries from 1979 (when her classification under the union contract became effective) to 1983 are set forth below:

|      | Sigurdson | Becker |
|------|-----------|--------|
| 1979 | 9,429     | 13,482 |
| 1980 | 11,016    | 14,372 |
| 1981 | 12,304    | 16,012 |
| 1982 | 13,692    | 17,472 |
| 1983 | 15,228    | 18,864 |

No one testified that Sigurdson was a difficult employee. Aaron Boettcher testified that she had excellent written and verbal communication skills. He said she is personable and easy to get along with "in a social setting," as opposed to a business setting. Mennenga testified that she has never raised her voice to him. The office secretary testified that Sigurdson is a very quiet person. Virginia Loren, who testified that she herself was not discriminated against, also testified that she was happy doing office work and did not particularly desire to do field work.

## ANALYSIS

Because of the substantial similarities in the language and purpose of the Minnesota Human Rights Act and Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e (1976), the Minnesota Supreme Court has applied principles developed in Title VII litigation to claims arising under the Human Rights Act. *Hubbard v. United Press*

*International, Inc.*, 330 N.W.2d 428, 441 (Minn.1983) (citing *Fisher Nut Co. v. Lewis ex rel. Garcia*, 320 N.W.2d 731, 734 (Minn. 1982); *Danz v. Jones*, 263 N.W.2d 395, 398–99 (Minn.1978)). In *Hubbard* the court recognized the three-part analysis of *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), as the beginning point for scrutiny of a discrimination case.

This analysis, discussed at length in *Hubbard*, was not used by the trial court in the case before us. The majority recognizes the *McDonnell-Douglas* procedure as controlling but overlooks the trial court's failure to apply it by saying that even though the court did not refer to the case or the process in its findings or memorandum, "it is clear that the court used this three-step process to arrive at its decision." It is difficult to see how this is clear. The difficulty is compounded because the majority fails to use the *McDonnell-Douglas* framework in its own analysis.

Did Renja Sigurdson fail to establish a prima facie case of discrimination? The trial court appears to hold this when it concludes that there was no differential treatment based on sex. This determination, however, is erroneous. The evidence is uncontroverted that as of December 1976 Sigurdson was a certified assessor but she was never promoted to a deputy assessor position. She was not promoted because she did not do field work. She was not allowed to do field work because the assessor "didn't like the idea of sending ladies out with a car * * *," and although he didn't object to women "riding out with him," he didn't want to have to do that every day for "three months out of the year."

The majority attempts to establish that Sigurdson was not denied a deputy assessor position because none were available. The trial court made no such finding, although it did find that she was allowed to do field work without being promoted. The evidence shows that the majority's determination is unsupported. When Duane Johnson left the office in April of 1976, no

one was appointed to replace him as a deputy assessor. The trial court specifically found that deputy assessor Dean Boettcher resigned his position in June of 1979. At the staff meeting that month Aaron Boettcher stated that he intended to hire two men to replace Dean. Furthermore, promotion to the position of deputy assessor did not require an opening because the number of deputy assessors was not fixed. Minn.Stat. § 273.06 (1978) provides that a county assessor may appoint any "well-qualified citizen" as a deputy assessor. There was no limitation on the number of deputies that could be appointed, and there were no prerequisite qualifications. Both county assessors exercised considerable latitude in their appointment and promotion policies. The prima facie case is firmly established, primarily through the employer's own testimony.

The majority acknowledges the discriminatory attitudes of Aaron Boettcher but denies that they affected his decision not to promote Renja Sigurdson. This approach suggests that Sigurdson has met her burden of presenting a prima facie case and that a nondiscriminatory basis for the employment actions must be established. Again the majority supplies its own conclusion, not included in the trial court's conclusions, that Sigurdson was penalized for her failure to accept management decisions. This constitutes step two of the *McDonnell-Douglas* procedure, which Sigurdson is entitled to rebut by showing that the reason stated was not the real reason but instead a "cover" for discrimination. The *McDonnell-Douglas* court suggests that evidence relevant to a showing of pretext includes the treatment of the claimant during the term of employment, the employer's reaction, if any, to employee's legitimate civil rights activities, and the employer's general policy and practice with respect to employment of the protected class. 411 U.S. at 805, 93 S.Ct. at 1825. Since step two takes place at the appellate level, Sigurdson is denied the opportunity for rebuttal. However, even without the rebuttal opportunity, the facts expose the pretext. The difficulty that the Isanti County assessor had in working with Sigurdson was based on her desire to be treated equally. Sigurdson's assertion of her rights may well have "disrupted" the County Assessor's office, but employees are not legally obligated to enforce or abide discriminatory practices.

The trial court's instructions to the advisory jury incorporate the concepts of *McDonnell-Douglas*. The advisory jury determined that Renja Sigurdson was discriminated against in the promotion and advancement policies of the Isanti County Assessor's Office. However, the trial court failed to apply the *McDonnell-Douglas* framework in its own analysis of the evidence, and this results in error. The completeness of the record developed at trial does not compensate for the error because the trial court's findings and conclusions are at odds with the evidence. The jury's finding is supported; the trial court's findings are not.